GEORGE CURTIS, Plaintiff in Error, v. ANSON ROOT and THOMAS AVERY, Defendants in Error.

ERROR TO KENDALL.

A, on the 5th of March, 1845, being the owner of certain premises, by an article of agreement, granted, bargained, sold, aliened, conveyed and confirmed, etc., the same unto B, for which B agreed to pay three thousand dollars in installments, etc., upon the payment of one of which, B was to take possession. On full payment, A was to give full deeds to B. Upon failure to pay any of the installments, the contract was to be void at the election of A, who might reёnter and re-possess, etc. B took possession and commenced building, and continued in possession fourteen months. B borrowed of A two sums of money, and executed mortgages on the same premises to secure the payment of them. A and B afterwards agreed, that on failure by B to pay any installment, A might reёnter by force, which he subsequently did, and held open possession. A foreclosed his senior mortgage by *scire facias*, and obtained execution, upon which the premises were sold, and A was the purchaser. At the same term, C, a creditor of B, obtained a judgment against B, upon which execution issued, upon which C, in proper form, etc., redeemed from A, who took the money. The sheriff then advertised on the execution in favor of C, and sold to D, and D conveyed to E, all proceedings being regular. E brought ejectment against A, who all along held possession ; *held*, that the first contract from A to B was a mere agreement to sell, it appearing from the contract and circumstances that such was the intention of the parties ; *held further*, that B had such an interest in the premises as authorized him to mortgage them, and that A was not estopped from asserting his title as the original vendor of the premises, by any act or omission of his, and that E was, by the levy, redemption and purchase under D, placed in the same position in which B stood by his relation and contracts with A. The doctrine of estoppel considered and examined.

THIS was an action of ejectment, by plaintiff, against defendant, commenced in the Kane Circuit Court, Nov. 18, 1850, and afterwards taken by change of venue to Kendall county.

Prior to the 5th of March, 1845, Root, (defendant), was the owner in fee of the property described in the declaration.

That on that day Root sold the property to Ruel Ambrose, by an article of agreement, which states that Root, in consideration, etc., " has *granted, bargained*, sold, *aliened, conveyed*, and confirmed, and by these presents *doth grant, bargain*, sell, etc.," the property to Ambrose—this agreement was under seal.

For which Ambrose agreed to pay Root, three thousand dollars, in six equal annual installments, except $40, which was to be paid on the 23rd of May then next, and to apply on the first installment of interest, etc., and Ambrose was then to have possession, and the first installment was to be paid in one year from the 23rd of May then next.

Root covenanted to give full deeds when Ambrose complied.

It was further agreed, that upon non-compliance by Ambrose by payment, etc., Root might, at his election, declare it void, and re-enter and possess the premises.

The $40 was paid at the time agreed; but no more was paid by Ambrose on it. Ambrose entered into possession of the premises, and commenced building a mill, and continued in possession until July, 1846.

In July, 1845, Ambrose borrowed of Root, about $670, and executed a mortgage to Root, to secure its payment, on the premises ; this was payable in June, 1846.

In August, 1845, Ambrose borrowed of Root the further sum of $1,568, and to secure this sum executed to Root another mortgage on the same premises, payable September 1st, 1846. The last mortgage has not been paid, or foreclosed, but is still held by Root.

On the 20th day of May, 1846, Root and Ambrose entered into another agreement, by which Root extended the time of payment, of the first installment, until the 23rd of July then next, and Ambrose covenanted that if he did not pay the installment by that time, Root might put him out of possession by force. In pursuance of this agreement, Root took possession of the premises in July, 1846, and has been in possession ever since, Avery being in possession with him.

On the 30th of July, 1846, Root commenced suit by *sci. fa.* to foreclose the first mortgage, and on the 31st of August, 1846, he obtained judgment of foreclosure.

On the 24th of December, 1846, the premises were sold by virtue of a special execution on said judgment of foreclosure, to Root, for the amount of his judgment, and cost, etc., and a certificate of sale was issued to him.

At the same August term of court, 1846, one Thaddeus Spencer obtained a judgment against Ambrose, for the sum of $3,786.75 and costs, which judgment was afterwards assigned to one Jonathan Haven.

On this judgment, execution issued, and in proper time and form, Haven, in Spencer's name, redeemed from Root's sale, by paying Root the amount of his bid, and ten per cent. interest, which was received by Root. The premises were advertised by the sheriff on Spencer's execution, and sold on the 5th of April, 1848, to said Haven, all in due form.

That afterwards Haven conveyed the premises to the plaintiff, February 12, 1850.

The court found for the defendants, and plaintiff excepted, and assigned for error, the finding of the court.

B. S. MORRIS, and FARNSWORTH & BURGESS, for Plaintiff in Error.

B. C. COOK, and W. B. PLATO, for Defendants in Error.

BREESE, J.   This is an action of ejectment brought by Curtis against Root and Avery in the Kane Circuit Court, and by change of venue tried in the Kendall Circuit Court, for a certain lot of land and mill, in the town of Elgin.   The cause was tried by the court without a jury.   The facts, as agreed, are as follows:

That on and prior to the 5th day of March, 1845, the defendant Root was the owner in fee of the property described in the declaration.   On that day he sold the property to one Ruel Ambrose, by an article of agreement which states that Root, in consideration, etc., "has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents doth grant, bargain, sell, alien, convey and confirm" unto the said Ambrose, the property in controversy, for which Ambrose agreed to pay Root three thousand dollars, in six equal annual installments, with eight per cent. interest annually, except the sum of forty dollars, which was to be paid on the 23rd of May then next, and to apply on the first accruing interest, and Ambrose was then to have possession, and the first installment was to be paid in one year from the said 23rd of May.   Root covenanted to give full deeds on full payment by Ambrose.   It was further agreed that upon failure by Ambrose to pay any of the installments, the contract was to be void, at Root's election, and he might re-enter and repossess himself of the premises.   The forty dollars was paid at the time and indorsed on the agreement, but no more was paid at any time by Ambrose.

Ambrose entered into possession of the premises and commenced building a flouring mill thereon about the 23rd of May, 1845, and continued in possession until July, 1846.

On the 23rd of July, 1845, Ambrose borrowed of Root six hundred and seventy dollars, to be paid in June, 1846, and executed a mortgage on these premises to secure the payment, which was duly acknowledged and recorded.

On the 5th of August, 1845, Ambrose borrowed of Root the further sum of $1,568, and executed to Root a like mortgage on the premises to secure its payment, which was filed and recorded at the same time with the first mortgage.   This last mortgage has not been paid, or foreclosed, but is yet held by Root.

On the 20th of May, 1846, Root and Ambrose entered into another agreement, by which Root extended the time of payment of the first installment to the 23rd of July, 1846, and covenanted if he failed to pay it then, Root might put him out of possession by force and enter himself into possession.

In pursuance of this agreement, Root entered and took possession of the premises about the last of July, 1846, and has been

in possession ever since, Avery being then in possession with him.

On the 30th of July, 1846, Root commenced suit by *scire facias* to foreclose the first mortgage of July, 1845, and on the 31st of August, 1846, he obtained judgment and a special execution.

On the 24th of December, 1846, the premises were sold by virtue of said special execution to Root for the amount of his judgment, and costs, and a certificate of sale delivered to him.

At the same August term, one Thaddeus Spencer obtained a judgment against Ambrose for the sum of $3,786.75 and costs, which judgment he afterwards assigned to one Jonathan Haven, who, in Spencer's name, took out execution thereon in proper time and in proper form. This execution he delivered to the sheriff, together with a sufficient amount of money to redeem the premises from the sale made to Root under his first mortgage judgment, which was done in proper time and form, and the redemption money paid to Root by the sheriff and by him received. The premises were then advertised by the sheriff on Spencer's execution, and sold on the 5th of April, 1848, to Haven, all in due form. Haven, February 12th, 1850, conveyed the premises to the plaintiff.

On these facts the court found for the defendant, and plaintiff excepted, and assigns for error here this finding of the court.

The first question which presents itself is, what is the character and effect of the agreement of March 5th, 1845? The plaintiff insists that the legal title passed to Ambrose by it, and that it is, to all intents and purposes, a deed conveying the legal title. The defendant insists that it was a mere agreement to sell.

To determine this question, the intention of the parties is to be regarded, in this, as in all other cases, and that is to be ascertained from the instrument itself, and concurring circumstances.

The instrument does not purport to be a deed, but "Articles of Agreement made and concluded" on the day of their date, with a covenant, that on payment of the money as agreed, Root, "the party of the first part, shall and will without delay, immediately, well and faithfully execute and deliver in person a good and sufficient full covenant deed, or deeds, and *thereby* assign and convey to the said party of the second part, his heirs and assigns, a good, perfect and unincumbered title in fee simple to the above described premises, with their appurtenances." This is the language of the instrument, as to the covenant on the part of Root.

But there is a mutual covenant, also, to be considered in arriving at the intention of the parties, and this is it:

"And it is mutually covenanted and agreed between the parties hereto, that in case default shall be made in any of the

34

payments, principal and interest, at the time or any of the times above specified for the payment thereof, then this agreement and all the preceding provisions hereof shall be null and void and no longer binding, at the option of the party of the first part, his representatives or assigns."

We have then, but to look at the instrument to determine its character. It speaks for itself, and is a mere agreement to convey, so understood and accepted by Ambrose, and not an absolute conveyance, or intended so to be.

The next question is, had Ambrose, by this contract, such an interest in the premises, as authorized him to mortgage them?

The doctrine is understood to be that every thing which may be considered as property, whether in the technical language of the law denominated real or personal property, may be the subject of mortgage, as advowsons, rectories, tithes. Reversions and remainders being capable of grant from man to man, and possibilities also being assignable, are mortgageable, a mortgage of them being only a conditionable assignment. Rents, also, and franchises may be made the subject of mortgage. 1 Powel on Mort. 17, 18.

By the agreement in this case, Root had a right to re-enter at his option, if the payments were not made at the time fixed, and time was thereby of the essence of this contract, and to save the contract, who can doubt the power of Ambrose to pledge his interest in the land, to raise the money for such purpose? Who can doubt his power to sell and assign the contract? His power to mortgage it to Root, is unquestionable. Besides, the case shows that the mortgagor had built a mill on the property with money borrowed of Root, and with Root's knowledge, and had paid a portion of the purchase money, all which makes a mortgageable interest. 2 Story Eq. Juris., sec. 1021. Under our statute, Ambrose's interest could be sold on execution, and would pass to his heirs, so that he had a mortgageable estate.

The next question is, is Root, by the acceptance of this mortgage, estopped from asserting his title as the original vendor of the premises, and did he admit thereby, that the interest thus disposed of by Ambrose was paramount to his own as holder of the legal title?

This question need only to be stated to be answered. It answers itself. It is an admission by Root, that he recognized such an equitable interest in the premises in Ambrose, as would secure him in his advances of money to be expended on it, and in which a court of equity, under all circumstances, would protect him. Had Ambrose paid the mortgage, he would only have

been remitted to the agreement of March 5th, for the sale and conveyance, and Root to his position as vendor.

It follows, therefore, that Ambrose having a mortgageable interest, and Root a right to take the mortgage on it, he had a right to pursue it, and foreclose on condition broken, and sell under it. Having a right to sell, he had the right to purchase all such interest as Ambrose had, and purchasing, he placed himself in the position all purchasers of land under a *fi. fa.*, special or otherwise, are placed by the law, that is, to have such rights as they may have acquired by their purchase taken from them, by returning to them their money, with ten per cent., and nothing more. He could not be deprived, by accepting such moneys, of any rights he owned outside of, and beyond, and independent of those acquired by the sheriff's sale and purchase. Such is not the the meaning or policy of the law. Suppose Ambrose, himself, had redeemed from this sale, in what position would the parties be then? Why, precisely in *statu quo*, in the very same position they were before the judgment on the *sci. fa.* and sale,—Ambrose remitted to his rights under the contract to convey, and Root to his under the same contract, as owner of the fee.

The judgment creditor, Haven, having redeemed, he is remitted to Ambrose's equities, and nothing more. He is placed in Ambrose's shoes, and as by the record he is notified of the subsequent mortgage to Root, and by the open and visible possession by Root, of the premises, that he, being in Ambrose's position, must go on and perfect Ambrose's contract.

With what propriety can it be urged, that Root is estopped by any of these acts done, from falling back on his original title? Estoppels are not to be favored because the truth may be excluded; therefore, no party ought to be precluded from making out his case according to its truth, unless by force of some positive principle of law.

Do the facts as they appear, as done by Root, amount to an estoppel? If they operate at all, it must be as an equitable estoppel, arising from these matters *in pais*. These estoppels are rather favored in modern days, as tending to prevent or punish frauds.

It seems there must be some affirmative act done, or some declaration or admission made by one party, which if acted on by the other party, would, by deceiving him, subject him to loss and injury. Estoppels were once accounted odious in law, and not allowed, unless very plainly and clearly made out. *Sampson* v. *Cooke*, 7 Eng. C. L. R. 205.

There must be something said or done which amounts to a fraud in fact. *Stephens* v. *Baird*, 9 Cowen R. 274; *Presbyterian Congregation of Salem* v. *Williams*, 9 Wendell R. 147.

Where one, by his word or conduct, willfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded, estopped, from averring against the latter, a different state of things as existing at the same time.

As expressed by Justice COWEN, in the case of *Degell* v. *Odell,* 3 Hill R. 219 : "An admission by the defendant intended to influence the conduct of the man with whom he was dealing, and actually leading him into a line of conduct which must be prejudicial to his interests, unless the defendant be cast off from the power of retraction,—this I understand to be the very definition of an estoppel *in pais.* For the prevention of fraud, the law holds the admission conclusive."

Instances in illustration are innumerable, as where a party stands by at the sale of his property, though under a void authority, and *encourages* purchasers to bid, he is guilty of a direct fraud. So, if one at a sheriff's sale of his lands, declares a certain tract to be included in the levy, and thereby the purchaser was induced to purchase, it gives him an equity which a court of chancery will enforce.

And the effect is the same, if one, seeing another acting under a delusion, stands quietly by, without giving notice of his superior right. *Epley* v. *Witherow,* 7 Watts R. (Penn.) 168.

It is quite apparent from these cases and many others which might be cited, there can be no fraud, where the purchaser or other actor was, or ought to have been, acquainted with the matter in which he was engaged, or even had the means of knowledge and neglected to avail himself of them, or where the party was not influenced to act on the faith of the false suggestion or silence of one bound to speak. And it is a rule if an act can be referred to an honest motive the party will not be estopped, although upon one construction his conduct may be inconsistent with the right which he afterwards sets up. *Heare* v. *Rogers,* 17 Eng. C. L. R. 450.

Testing this case by these principles, it will readily be perceived this doctrine cannot apply to Root. In the first place, he did not induce Haven to redeem the land as a judgment creditor. In the next place, Haven had the means of knowing Root held another mortgage, for it was on record ; and Root was in open, visible possession, under the terms of that very mortgage. This would be notice of his right to hold it as the original owner of the fee. In redeeming, Haven acted at his own peril, and wholly on his own advice and responsibility, and Root had a perfect right to receive the money, as well from Haven as from Ambrose himself. All that Haven could well

School Inspectors of Peoria *v.* The People ex rel. Grove.

claim on redeeming, is the privilege of performing Ambrose's contract, and there is no proof to show that he did not know well the rights he acquired by redeeming. It is clear, therefore, that the act of Root in receiving the redemption money, can have a construction consistent with honesty and good faith, and that is, to let Haven in to perform Ambrose's contract, which under the circumstances, as the money had been used in improving the land, and the land rising in value, might have been a very desirable object.

A case quite analogous to this is reported in 13 Johns. R. 463, *Jackson ex dem. Whitlock* v. *Mills.* Where land was purchased under a junior judgment by an agent, who took a deed from the sheriff to himself and then conveyed the land to his principal, the agent is not thereby estopped from levying on the same land, under a senior judgment, and purchasing it himself.

It is urged, however, that the fee which Root possessed in the premises was merged in this mortgage. An estate in fee can hardly be merged in one of much less dimensions—into a conditional estate, subject to be defeated.

Merger, too, is a question of intention. *Jarvis et al.* v. *Frink,* 14 Ill. R. 396. No one fact in this case shows that Root intended, by proceeding on the first mortgage, to give up his second mortgage or his original fee in the land. On the contrary, all the facts go to show he did not so intend, for, in accordance with the agreement, after condition broken, he took possession of the land and remained in possession until the commencement of this suit. He resumed his position as owner of the fee.

Seeing no error in the finding of the court, we accordingly affirm the judgment.

*Judgment affirmed.*