NELS ANFENSON et al., Trustees, Appellees, v. HENRY BANKS, Appellant, et al.

**PARTNERSHIP:** The Relation—Ostensible Partner—''Holding Out.'' One who has never held himself out as the partner of another, and who, when he learned that he had been falsely held out by such other as such partner, promptly sought out such other and repudiated such holding out, and received a promise that such holding out would cease, is, *nothing else appearing*, under no legal or moral duty to give further publicity to his repudiation.

> PRINCIPLE APPLIED: See No. 3.

**TRIAL:** Taking Issue from Jury—Inferential Withdrawal of Unsupported Issue—Effect. A wholly unsupported issue should be unequivocally withdrawn from the jury. An *inferential* withdrawal may not be sufficient, especially when the party adverse to the issue requests a specific withdrawal. So held on the issue of actual partnership.

**ESTOPPEL:** Equitable Estoppel—Implied Fraud—Estoppel to Deny Partnership. Conduct which will work an estoppel *in pais*, in those cases *where there is no affirmative evidence of wrongful design or fraudulent purpose*, must be so grossly negligent or of a character so manifestly misleading to others that it would be tantamount to a fraud to permit the actor to escape liability to those who, in the exercise of reasonable diligence, have been misled to their injury. So held on the issue of a partnership by estoppel.

> PRINCIPLE APPLIED: One Penfield operated in a small village a private unincorporated bank, under the name of "The Bank of Kelley." He caused a booklet relative to the financial affairs of the bank to be issued and circulated in the village and contiguous territory. In effect, he represented in this circular that one Banks, his father-in-law, was a partner in said banking business. This representation was wholly without the authority of Banks. Very soon thereafter, Banks was informed by his nephew that such a paper had been issued, and on the following day, Banks went to the village for the purpose of learning why his name had been so used. Penfield was absent from the village, but Banks protested to the cashier against the use of his name, and the cashier promised to report the

matter to Penfield and to have the matter corrected. On the same day, Banks saw Penfield's father, whose name had also been used in the circular, and the father told Banks that he had seen a lawyer about the use of their names, and assured Banks that he need not bother about it. Two days later, Penfield visited at Banks' house, and Banks again protested against the use of his name. Penfield told Banks that he used his (Banks') name because he thought it would make the bank look better. Penfield apologized, and promised that the use of Banks' name should cease. This promise was kept, and the circular was not thereafter circulated; but, from the circulation already had, some general reputation and talk subsequently grew up, in and around the village, that Banks was a partner in the bank, a fact of which Banks had no knowledge. After the last talk with Penfield, Banks gave the matter no further attention. Banks lived on a farm over 6 miles from the village, and did all his business and banking in another town. Banks' visits to the village were infrequent. At times, he was seen in the bank and behind the counter, but this latter practice was common with callers at the bank. He never did any business for the bank, never assumed any authority in the management thereof, and was never a borrower of or loaner to or depositor in the bank, or in any manner interested therein. Three and a half years after the circular or booklet was first issued, the bank failed, and Penfield absconded. Many of the old depositors then claimed that they had allowed their deposits to remain in the bank on the strength of said circular, and their belief that Banks was a partner. Many new depositors claimed that they had made their deposits on the same basis and in the same belief. Some of the depositors had seen and read the circular. Other depositors had never seen it, and knew nothing of it except what they had gathered from public rumor and talk. After the bank failed, Banks, for the first time, actually saw one of the circulars. Banks was at all times known to all the depositors, either personally or by reputation. None of the depositors ever asked Banks whether he was a partner in the bank, though they had ample opportunity to do so. Banks had no knowledge that anyone was dealing with the bank on the belief that he (Banks) was a partner therein. The depositors sought to hold Banks as a quasi partner.

*Held*: (1) That Banks was under no legal or moral duty to give wider publicity to his repudiation of Penfield's unauthorized acts.

(2) That Banks, being guilty of no moral turpitude, was not equitably estopped to deny that he was a partner of Penfield's.

(3) That Banks was under no obligation to speak, further than he did speak, with reference to Penfield's unauthorized act, and therefore his subsequent silence did not work an equitable estoppel.

(4) That, irrespective of the conduct of Banks, the depositors might not recover, because of their failure to exercise due diligence to learn whether Banks was in fact a partner of Penfield's.

ESTOPPEL: Equitable Estoppel—Silence—Duty to Speak. Silence, when there is no moral or legal duty to speak, cannot work an estoppel *in pais.*

PRINCIPLE APPLIED:     See No. 3.

PARTNERSHIP: The Relation—Third Persons—''Holding Out''— Evidence—Reputation. Evidence that a person is generally reputed to be the partner of another, when in fact no partnership existed, is admissible solely on the one narrow issue whether the party who seeks to establish a partnership by estoppel relied on the reputed existence of such partnership.

PARTNERSHIP: The Relation—Evidence—General Reputation. Concede, *arguendo,* that general reputation that one person is the partner of another might have the .force of *notice* of such reputation to the one sought to be charged, yet manifestly such could not be the case when such reputation existed only in a community where the one sought to be charged neither resided nor did business.

PARTNERSHIP: The Relation—Evidence—Reputation—Knowledge. No one should be held to be under a *duty to know* that he is reputed to be the partner of another when in truth he .does not know such fact, directly or indirectly, and when for the existence of such reputation he is in no manner responsible.

PRINCIPLE APPLIED:     See No. 3.

TRIAL: Instructions—Form, Requisites and Sufficiency—Implied License to Consider Incompetent Testimony. Instructions which limit the *incompetency* of testimony (which is incompetent on both of two issues) to one issue only, may be prejudicially erroneous, because impliedly leading the jury to infer that such testimony is competent on the remaining issue. So held where both an actual and a quasi partnership were in issue,• and the court, inadvertently perhaps, limited the incompetency of hearsay testimony to the issue of actual partnership only.

**PARTNERSHIP:** The Relation—Quasi Partnership—Evidence—Sufficiency. Certain facts and circumstances in evidence reviewed, and held incompetent to show that one sought to be held as a quasi partner ought to have known that people were dealing with the business on the assumption that he was a partner therein.

**ESTOPPEL:** Equitable Estoppel—Diligence to Learn the Truth. One setting up an estoppel by conduct is under obligation to exercise good faith and due diligence to know the truth. Therefore, the creditors of a bank who seek to hold defendant as a quasi partner because of his having been held out by another as a partner, may not recover if they had ample opportunity to learn, with trifling trouble or expense, that defendant was not such partner, and failed to avail themselves of such opportunity.

    PRINCIPLE APPLIED:   See No. 3.

**PARTNERSHIP:** The Relation—Partnership by Estoppel—Evidence. On the issue of a partnership by estoppel by reason of the defendant's having been held out as a partner, circulars setting forth that defendant was a partner in the business, though issued without the authority of the defendant, are admissible as tending to show what the creditor relied on in extending credit.

**PARTNERSHIP:** The Relation—Partnership by Estoppel—Hearsay. On the issue of a partnership by estoppel, based on the fact that defendant had been "held out" as a partner, in a circular issued without the authority of the defendant, evidence of what a creditor who had never seen the circular had been *told* about the circular is inadmissible, unless some culpable act or omission with reference thereto is first brought home to the defendant.

**PARTNERSHIP:** The Relation—Partnership by Estoppel—Burden of Proof. One who seeks to hold another as a quasi partner, on the theory that such other had been held out as a partner, has the burden to show affirmatively: (a) That such other assented to such holding out; or (b) that such other, by negligence so gross as to be tantamount to fraud, permitted such holding out to continue, and that those dealing with the supposed partnership were deceived thereby to their damage.

    PRINCIPLE APPLIED:   See No. 3.

*Appeal from Story District Court.*—R. M. WRIGHT, Judge.

TUESDAY, JUNE 26, 1917.

REHEARING DENIED MONDAY, SEPTEMBER 24, 1917.

THE opinion states the nature of the case.—*Reversed.*

*George A. Undewood* and *John Y. Luke,* for appellant.

*Dyer, Jordan & Dyer,* *Goodykoontz & Mahoney* and
*B. B. Welty,* for appellee.

WEAVER, J.—In the year 1903, one
1. PARTNERSHIP: Starr, who was conducting a small private
the relation: banking business in the village of Kelley,
ostensible part- 
ner: "holding in Story County, Iowa, sold the same to
out." E. J. Penfield, who continued the business
under the name of "The Bank of Kelley," until the year
1911, when he absconded, leaving the bank in an insolvent
condition. Thereafter, plaintiffs herein, for themselves and
as trustees of numerous depositors in the bank, brought
this action at law, alleging that the defendant Henry
Banks was a partner with Penfield in said business, and
therefore personally liable for the payment of their several
claims. In another count of the petition, plaintiffs allege,
in substance, that the appellant, Banks, knowingly
allowed Penfield to hold him out to the world as a partner
in the business, and did not deny or repudiate such repre-
sentations, thereby inducing plaintiffs and those whom they
represent to become depositors in the bank, relying upon
appellant's credit and financial responsibility, and that, by
reason of such conduct, he has estopped himself to deny
liability in this action.

The defendant denies the alleged partnership, and de-
nies that he is in any manner chargeable with the debts
of the bank, or that he has been guilty of any conduct
which estops him from pleading and relying upon such de-
fense to plaintiffs' claim. There was a trial to a jury,
and verdict returned for plaintiffs, aggregating $22,132.81.
From the judgment entered on said verdict, the defendant
Henry Banks appeals.

The record is very voluminous, rendering it entirely

impracticable to set forth all the matters and things having legitimate bearing upon the merits of the litigation, and in discussing the facts, we shall, to a great extent, speak of what the testimony fairly tends to show, without attempting to quote the language of witnesses, except as it seems necessary to make the situation clear. It will be quite impossible to take up and discuss each separate point pressed upon our attention by counsel in argument, and we shall confine our discussion to such only as appear to us of controlling importance.

I.   We give first consideration to the question whether there is any evidence to support a finding that defendant was in fact a partner in the Bank of Kelley.

2. TRIAL: taking issue from jury: inferential withdrawal of unsupported issue: effect.

A careful search of the record fails to reveal even a scintilla of support for the claim that he ever, at any time, sustained such relation to Penfield or to the bank. On the contrary, the negative of that proposition seems to be established to a moral certainty. Counsel for appellees do not contend in argument that an actual partnership was proven, but rest their case upon the theory that the evidence justifies a finding of what they term an "ostensible partnership," a subject which we shall consider in a later paragraph of this opinion. Indeed, they say that the question of a partnership in fact is not before us, because the trial court withdrew that issue from the jury. If the showing made in the abstracts could be said to bear out this statement of counsel, further discussion at this point would, of course, be idle; but we do not so read the record. It there appears that, before the case was submitted, appellant's counsel requested an instruction withdrawing the issue of actual partnership from the jury, and such request was denied. It is true that the refusal was accompanied by a statement from the court that such direction was "substantially given in the court's

instructions," but a careful reading of the charge given the jury does not disclose an instruction of that character, or one which the jury would necessarily understand as its equivalent. In informing the jury concerning the issues submitted to them, the court stated the plaintiffs' allegations of both an actual partnership and a so-called ostensible partnership, or partnership by estoppel, and that appellant had taken issue thereon by denial. In another instruction, both actual partnership and ostensible partnership were defined to the jury, but neither here nor elsewhere was the jury told that the evidence would not justify a finding of an actual partnership between appellant and Penfield. It is to be admitted that the charge of actual partnership was not otherwise specially featured nor emphasized in the instructions, and the several paragraphs thereof were largely devoted to more or less minute directions as to the law governing "ostensible partnerships," or partnerships by estoppel; from all which, a jury of lawyers might reasonably have inferred that, in the mind of the court, the plaintiffs' claim on the latter ground presented the dominant issue in the case; but we regard it quite clear that a jury of laymen might well understand that they were at liberty to consider and pass upon both issues. It is, therefore, our opinion that the defendant's request for the distinct withdrawal from the jury of the issue of actual partnership should have been sustained.

II. Claims of depositors upon nearly seventy different counts were submitted to the jury, on all of which there were verdicts against the appellant. In order to comprehend the force and effect of the trial court's rulings and instructions, it will be necessary to refer at some length, but briefly as practicable, to portions of the testimony introduced. It was shown that, in August or September,

1907, a small circular or booklet was issued from the bank of Kelley, of which document the following was a copy:

"The Bank of Kelley

Kelley, Iowa

Capital ................................... . $10,000

Individual Responsibility, $75,000.00

E. J. Penfield, President

C. L. Siverly,  Cashier

Henry Banks

F. W. Penfield

(Above is front page)

(2d page)

"We invite your attention to the first sheet of this announcement showing an individual responsibility of $75,000 and giving the names of the owners and managers of this bank.  We are proud of this showing and desire to thank our many patrons for their loyalty in the past and hope we may be of still more service to you in the future.  The policy of the Bank will continue the same, paying 4 per cent interest on time deposits, clerking sales and discounting notes at current rates.  Again thanking you, we are,

"Yours for business,

"The Bank of Kelley."

Some of these booklets were distributed on the counters of the business houses of Kelley, others enclosed in passbooks of depositors, and still others passed out by Penfield to his customers.  About the same time, if not before, a sign in large letters, reading, "Bank of Kelley, Individual Responsibility $75,000," was placed upon the front window of the bank building, but no names were attached thereto.  F. W. Penfield, whose name appears in the printed advertisement, was the father of E. J. Penfield, and the appellant, whose name appears in the same connection,

was the father of E. J. Penfield's wife. Appellant was a farmer living 6½ miles from Kelley and 4½ miles from the city of Ames, which was his principal market town, and the place where he did such banking business as he had occasion to transact. Kelley was a small village, of comparatively few business places, and appellant's visits there were comparatively infrequent—he going there occasionally to attend public sales, and at times to call upon his daughter. When in the bank, he was at times seen behind the counter, as was the custom of many other callers and visitors. No one ever knew him to transact business for or with the bank, or saw him assume any authority therein. The nearest approach to any such testimony is the statement of one witness who says he once saw him looking into a book behind the counter, but he does not know or pretend to say what was the nature or character of the book to which he refers.

Appellant testifies, and there is no evidence whatever to contradict him, that he never invested a dollar in the bank or in the business, and never consented to or authorized the use of his name by Penfield in connection with the business; that he never loaned any money or credit to Penfield or to the bank, was never a borrower there, and never made a deposit therein. In these matters, he is fully corroborated by the several cashiers and clerks serving the bank during the period under consideration. Very soon after the booklet was issued, a nephew of appellant's told him he had seen or heard of it, and on the following day, appellant went to Kelley and went to the bank for the purpose of ascertaining the meaning of such use of his name. Penfield was out of town, but Siverly, the cashier, was present, and to him appellant broached the subject and protested against the unauthorized use of his name. The cashier promised that he would report the matter to Penfield on his return and have him rectify it. Later, on the

same day, appellant saw F. W. Penfield, whose name had been coupled with his own on the printed document, and was informed by him that he had consulted a lawyer on the subject, and that appellant "need not bother about it; it is all right." This visit to Kelley was on Friday, and on Sunday following, E. J. Penfield came to the farm, and, being called to account by appellant for the unauthorized use of his name, he apologized, saying he did it because he thought it would make the bank look better, and promised that there would be no more of it, and that he would "straighten it right up." Appellant never saw the paper itself until after this suit was begun, and his only knowledge of its contents was such as he obtained from his nephew's report to him that his name was used therein as having some connection with the bank. The evidence strongly tends to show that his protest to Penfield and the cashier had the effect of putting an end to the issuance and circulation of the objectionable circular, and that from that time until the collapse of the bank, 3½ years later, it was not renewed or continued. All the depositors who claim to have seen and been influenced by the printed circular locate the time as being in the summer or fall of 1907. At least 14 of the depositors who were permitted to recover testify that they never saw the circular, but most of them say they heard about it. A large majority of the depositors had been such from a time anterior to the issuance of the booklet, and continued in that relation until the bank closed; but, in avoidance of the natural effect of this admitted fact, they swear that they would have withdrawn their business from the bank had they not believed appellant to be responsible for the bank's debts. Others became depositors long after the issuance of the booklet. They never saw the paper and knew nothing of it except as a matter of hearsay from others. There was no newspaper published in Kelley, and, so far as shown, appellant did not know

what persons were depositors or customers of the bank; and though he was known, either personally or by reputation, to all of them, no one of them at any time applied to him for information as to his business relations with the bank or Penfield, or notified him that anybody was patronizing the bank on the credit of his supposed interest therein; nor is it shown that any of these depositors ever knew or heard that information of Penfield's unauthorized act had been reported to appellant by his nephew or any other person.

It is the claim of plaintiffs, however, that, when knowledge came to appellant of the issuance of the booklet, it was his duty to make all reasonable effort to publicly repudiate the act of Penfield in so publishing his name, and to bring such denial on his part to the attention of those who might be misled by such advertising into giving the bank credit to which it was not entitled, and that the question whether the appellant did his duty in this respect was for the jury. It is further contended that the evidence was sufficient to sustain a finding against appellant in this respect, and that, as against all persons making deposits in the bank or continuing their deposits therein in the faith or belief that he was an owner or partner in the bank, he is estopped to deny that he did sustain such relation. This theory of the law and of the record was adopted by the trial court.

As having a proper bearing upon such alleged estoppel, the court allowed plaintiff to introduce certain evidence, which, at the risk of unduly extending this opinion, we think it necessary to set out in the language of the witnesses. In explanation of what follows, we may say that "Exhibit B" referred to is a copy of the booklet in question; also that this testimony was given in April, 1914.

E. N. Ryerson, who was permitted to recover from defendant the sum of $1,040, was examined in his own behalf,

and the following is an excerpt from the abstract of his testimony. After having told of depositing money in the bank, as shown by three certificates dated in February, 1911, a few days only before the bank closed, the examination proceeded:

"Q. Now, I will show you a paper marked by the reporter as Exhibit B, and ask you whether or not you ever saw that paper or one identical with it. (Objected to by all defendants as being incompetent, irrelevant, immaterial and calling for the conclusion and opinion of the witness. Objection overruled and defendants except.) A. I don't think I did. Q. You may state, Mr. Ryerson, whether or not you heard of a statement issued by the Bank of Kelley in the fall of 1907, concerning its responsibility? (Objected to by all defendants as incompetent, irrelevant and immaterial, leading and suggestive. The court: The objection will be overruled, and the witness will be permitted to answer the question, but for the purpose only of showing, if it does show, why he acted as he did act himself, without—I think probably that covers the reasons. Defendants except.) A. Yes, sir. (The objection is added that it is hearsay. The court: Well, that objection does not go to the fact that it might affect his mind, and that is the only purpose for which it is admitted at the present time. Overruled and defendants except.) Q. Have you answered, Mr.—? A. Well I will answer that. (The court: What is the answer?) A. I had the idea then, when I put that money in there, that the bank was good, and I heard the circular was out, and that it was marked on the window $7,500 someway. That is why I put that money in at that time. I thought it was good. (Defendants move to strike the answer as incompetent, immaterial, irrelevant, stating a conclusion of the witness. The court: It is admitted, but only for the purpose of showing his conclusion and opinion, and for no other purpose. Defendants except.) Q. Now, let me ask you what made you

think the bank was responsible? (Same objection as last made. The court: The same ruling, but it will be re-ceived only for the same purpose. Defendants except.) A. On account of the 75,000 that was out, and I saw it with my own eyes marked on the window, and that is my reason. Q. Now what do you mean by saying on account of the $75,000 that was out? A. The circular. (Objected to by defendants as incompetent, immaterial and irrelevant and calling for a conclusion of the witness, and cross-examin-ing his own witness. The court: The objection will be overruled, but it will be received only in so far as it affected the mind and act of this witness. Defendants except. The defendants make the further objection that that question has been answered by the witness. He stated that it was $75,000 marked on the window as their responsibility. Ob-jection overruled and defendants except. Question read.) A. Well, the circular gave me the idea. (Defendants move to strike the answer of this witness for the reason that it is incompetent, irrelevant and immaterial, in view of the fact that the witness stated that he never saw the circular.) A. I heard of it. (Objection and motion overruled and defendants except.) Q. Now, you say on account of the circular issued by the bank that gave you the idea that there was $75,000 back of it? (Objected to as incompe-tent, irrelevant and immaterial. The court: The objection will be overruled, but the testimony will be received only so far as it affected the mind and conduct of this witness. (Defendants except. Question read.) A. Well, I heard that it was out. And I saw it marked on the windows. The circular, I heard of that. Q. What were you told that that circular stated as to who were the owners of the bank? (Defendants ob-ject on the ground that it is immaterial, irrelevant and in-competent. And that the circular is the best evidence.) The court: Overruled, but the evidence will be received only

in so far as it affected the mind and conduct of this witness. Defendants except.)   A.  Well, I was told that it was Penfield and old man Penfield and Banks and Siverly. Q.  Now, Mr. Ryerson, about when did you hear this concerning this circular?   (Objected to by defendants as incompetent, immaterial and irrelevant.  Objection overruled and defendants except.)   A.  Well, that is pretty hard for me to know, the date when I heard it.  Somewhere around in—oh, about two years ago, I think, I can't just—   Q. You may state whether or not you believed that those statements that those parties were the owners of the bank were true?   (Objection by defendants that it is immaterial, irrelevant and incompetent, in view of former answer of this witness.  Objection overruled and defendants except.  Question read.)   A.  Well, I believed they were.  Q.  Now, you say you believed they were?  A.  Yes, at the time.  Q. You may state whether or not you believed that when you first heard it?   (Objected to as incompetent, irrelevant and immaterial and as an attempt to cross-examine his own witness.  Objection overruled and defendants except.)   Q. You don't understand it?  A.  No.  Q.  I want to know whether or not you believed those statements that you heard, that that circular was out, stating that these parties were the owners of this bank, were true?   (Objected to as incompetent, irrelevant and immaterial.  Court:  Overruled.  It will be received only in so far as it bears on the mind and purpose of this witness.  Defendants except.) Q.  Now, Mr. Ryerson, I will ask you to state whether or not you would have deposited your money in this Bank of Kelley if you had not believed that these parties that you have named were the owners of that bank and responsible for its debts?   (Same objection as last made; calling for a conclusion of the witness and a matter too remote. Objection overruled and defendants except.)   A.  No, sir. No, sir.  I would not.  Q.  When was it you first heard of this circular?   (Same objection as last made.  Same rul-

ing. Exception.) A. Well, I didn't take any particular attention when— Q. I know, but about when, if you could give some idea of when it was with reference to the time when you left here? (Same objections and same ruling. Same exception.) A. You ask me when I left here? About three years ago. Q. Well, when was it before that that you heard of this circular—about when? A. About two years.

Cross-Examination: "I heard of this circular somewhere around about the time it came out. It is somewhere in the neighborhood of two years since I first heard of the circular. I believed the circular to be true. I depended on it and all that. I wouldn't have put my money in the bank but for that. Q. And that you first heard of this circular about two years ago? (Mr. Mahoney: Now, I object to that, because the witness didn't state that he heard of the circular two years ago.) A. No, I— (The court: Well, I will have to sustain the objection in accordance with the fact. Defendants except.) I didn't read the circular, I just heard it. I heard quite a few talk about it. Q. Whom did you talk with? A. I didn't pay so much attention to it, but I heard it. What I heard and what other people said was enough to influence my mind and impel me to let my money remain in the bank. I don't remember a single person that told me about these facts. I paid no particular attention from the time I heard it, and it was all around, and I just thought it was all right. I couldn't help it though. I saw the 75,000 in the window, on the glass, nice, big, gold— I didn't pay much attention to names there on the window. Just paid attention to 75,000 was the capital of it. Q. Then you say, when you saw that statement in the window that there was seventy-five thousand behind it, that that influenced and controlled your mind, and you left your money remain there? A. Yes, sir. Q. And afterwards, you had a talk, you say, with a number of people, and that influenced you? A. Well, I

didn't really have a talk with them, but I heard it. I was
doing business there and— I was pretty often in Kelley.
I did not have a telephone. I didn't know Mr. Banks. I
knew Mr. Siverly. Q. Did you approach Mr. Siverly and
ask him, during all this time, when you say you heard this
rumor, about the truth of this circular? A. No, I didn't
ask him any— Q. Did you ever seek out Mr. Banks, and
try to ascertain the truth of him in regard to this so-called
circular? A. No, I didn't. (Exhibits Nos. 2, 3 and 4 of-
fered in evidence by plaintiffs. Objection by defendants
that they are irrelevant, incompetent and immaterial. Ob-
jection overruled and defendants except.)"

William Swanson, another depositor, who was found
entitled to recover an aggregate of $3,897.09 upon certifi-
cates issued by the Bank of Kelley in the year 1910, testi-
fied as follows:

"I have seen that paper, Exhibit B. I got it in Kelley,
one that is home. I got it in a letter and the children read
it to me, and that is all I paid attention to it. Q. Do you
know what was in the circular that your children read to
you? A. Well, I know it says $75,000 bond. Q. Was
there anything else in that circular that you remember?
A. No, I can't think of it. Q. At the time this circular
was received at your house, had you heard of Henry Banks?
(Objected to as leading and suggestive. He has already
stated he didn't know him. Overruled and defendants ex-
cept.) A. Well, people talked that he was giving bonds.
Q. People talked? A. Talked that Henry Banks was giv-
ing bonds for $75,000. Q. You heard some talk at that
time about Henry Banks, did you? A. Yes. Q. What
did you hear? A. Like I hear them talk he was the bonds
for the bank for so much. I didn't hear how much he was
worth, because I didn't know him, and I heard people said
he had a whole lot of land, and was well off, and so on.
That is all I know. Q. Did you ever talk to any other
person about this circular, except your children? A. No,

I didn't talk much. No, I didn't ask much questions. I don't understand it. Q. After this circular was sent to your home, did you believe that the statements in it were true? (This is objected to as incompetent, irrelevant and immaterial, and for the further reason that the witness has already stated that he does not remember anything that was in the circular with the exception of the statement of $75,000. Overruled and defendants except.) A. Yes, I believe so. Q. Now at that time, who did you think owned the bank? A. I thought Penfield. *I thought Penfield owned the bank.* Q. Did you think any other persons were interested in the bank? A. Oh, I didn't know that. I deposited some money in the Bank of Kelley. I had money there when it failed. I don't remember how much, around $4,000. It was on certificate. Exhibits 21, 22 and 23 are the certificates I received from the bank. I had some money there all of the time. Q. Now, Mr. Swanson, when you put this money in the bank, who did you think was responsible for the debts of that bank? (Objected to as incompetent, irrelevant and immaterial, and a repetition, the witness having already stated that he thought E. J. Penfield was the owner of the bank, and further than that he didn't know. Objection overruled and defendants except.) A. Penfield and—oh, I can't think of the name—Banks. (Plaintiffs offer in evidence Exhibit 21, which is a certificate of deposit issued to William Swanson by the Bank of Kelley, March 19, 1910, for $3,367. Exhibit 22, a certificate of deposit to same party from same bank, dated July 22, 1910, for $100. Exhibit 23, a certificate of deposit to same party from same bank dated Dec. 21, 1910, for $697. Objected to as incompetent, irrelevant and immaterial. Overruled and defendants except.)

The testimony of these witnesses is quite typical of that of the depositors generally, and the rulings made thereon reveal the theory of the trial court in its admission. Other depositors testifying in this case were asked

as follows: "Now at the time you made these various deposits, who did you think were the owners of the bank?" and, over appellant's objections, answered, "E. J. Penfield, F. W. Penfield and Henry Banks." Again: "What was the general opinion among the people as to the financial responsibility of the men named in that circular?" "What was the general opinion among the people that you talked to as to its financial standing?" And in each instance, the witness was allowed to give his understanding that appellant was an owner or partner in the bank. One witness, Mr. Sorenson, was examined as follows:

"Q. And what was your understanding in relation to his (Banks') financial responsibility, say along in the year 1907? (Objected to as immaterial, irrelevant and incompetent. Overruled and defendants except.) A. Well, at that time I don't know anything about it. I heard about his financial responsibility I should judge about 1909 or 1910. This was before I deposited any money there. I never saw one of those circulars that was issued by the Bank of Kelley. Q. Now, Mr. Sorenson, did you ever hear it stated by any person in the town of Kelley or vicinity as to who were the owners of the Bank of Kelley, and who were responsible for its debts? (Objected to as immaterial, irrelevant, incompetent and leading and suggestive to the witness. Court: It is unless it was prior to the time the money was deposited. Mr. Mahoney: Well, I mean prior to the time this money was deposited. Objection overruled and defendants except.) A. Well, Mr. Banks and Mr. Penfield, both of the Penfields, I mean— Q. Now, about when did you hear that? A. Well, about 1909. Q. And where did you hear it? A. Oh, just people talking around, most anywhere. All around Kelley and through the country, I might say. Q. Did you believe these statements that were made to you that these parties you have named were the owners of that bank and responsible for its debts?

(Same objection as last made. Same ruling and exception.)
A. I did.

G. A. Peterson testified:

"I didn't live in Kelley in 1907. I saw a circular like Exhibit B about the time the bank broke up. This was the first time. I heard of the circular before the bank broke up. My brother told me about a year before. I moved to Kelley in the spring of 1910. I heard of this circular in the summer time of 1910. I did not make any inquiries with reference to who were the owners of the Bank of Kelley in the fore part of the year of 1910. I heard who were purported to be the owners. I got my information in the vicinity of Kelley. Q. Now, I wish you would state what you learned or heard with reference to who the owners of the Bank of Kelley were at that time? (Objected to for the reason it is incompetent, hearsay, the witness not being competent to answer the question. Objection overruled and defendants except.) A. I understood that the two Penfields and Mr. Banks were the owners of that bank. (Move to strike the answer as incompetent, irrelevant, immaterial and hearsay. Overruled and defendants except.)"

I. N. Ball testified:

"I was a depositor in the Bank of Kelley, in 1911, I believe. I never saw a circular issued by the Bank of Kelley sometime in 1907. Q. Did you ever hear about the circular being issued? A. Well, I heard something about it, yes. That is when I came back from down there. I wasn't living here at the time, but after I came back. I returned from the southern part of the state in 1909, I think. The first of March of that year. I heard something about this circular about the time I returned. They said it wasn't safe at one time, but now it was all safe, before I deposited my money there. Q. Were there any names mentioned in regard to the ownership of the bank? (Objected to as leading and suggestive. Overruled and de-

fendants except.)    A.    Why, they told me these men was
interested in it; yes, sir.    It was Ellis Penfield, his father,
Henry Banks and Siverly.    I had known Henry Banks
quite a number of years.    He was east of Ames here.    I
knew he was pretty well fixed and had property.    After I
came back, I did not deposit any money in the Bank of
Kelley till fall of 1911.    (Must be 1910.)    Q.    When you
deposited your money in this bank, who did you think were
the owners of the bank?    (Objected to as incompetent, im-
material and irrelevant.    Overruled and defendants ex-
cept.)    A.    The men I have just spoke of."

   Lars Fjare, having testified, on examination in chief,
that he made a deposit in the Bank of Kelley in 1908, and
that he then thought or had heard that the Penfields and
appellant were responsible for the debts of the bank, said,
on cross-examination:

   "I never saw this circular myself.    I heard about it
the spring of 1908.    The first banking business I ever did
in this country was in the Bank of Kelley.    I had a little
money before this time, but I did not put it in the bank.
I heard that E. J. Penfield and his father and a man liv-
ing southeast of Ames, by the name of Henry Banks, a rich
farmer, was the owners of the bank.    That is what I heard
the circular stated.    I don't remember who told me about it
in the first place.    I can remember one person—I believe
it was William Peterson.    I didn't think about him a min-
ute ago.    I don't know how William Peterson got his
knowledge.    I suppose he read one of those circulars, but
I don't know whether he did or not.    I didn't talk with
anyone else about it.    I heard others talk among them-
selves.    Q.    Well, tell us all you remember.    A.    The talk
was all in Kelley, different kinds."

   All of the witnesses mentioned above recovered judg-
ment for the amount of their several deposits.

   In submitting the case, the court gave, among others,

the following instructions to the jury (the Italic being ours) :

"V. Evidence as to the general reputation of the existence of a partnership, while admissible as it may tend to prove a belief on the part of the depositor that there was a partnership and his reliance on the existence of the same, will not prove that there was an *actual* partnership, and it cannot be considered by you for such purpose, as no one can be made a partner against his consent on the mere declarations of another that such one is connected with him in partnership against one having no knowledge of such declarations and not consenting to the same. One may, however, become liable as an ostensible partner if the general reputation that he is a partner has been so persistent and so long continued as to raise the presumption that he is in fact a partner, and he has knowledge of such general reputation, or as an ordinarily careful and prudent man *should have knowledge* of such general reputation, but makes no attempt to contradict or deny the fact of partnership, and others are by such general reputation led to believe that he is a partner, and, acting on such belief and by reason thereof, are induced to extend credit and are damaged thereby.

"VI. In the course of these instructions, the words 'actual partnership' and 'ostensible partnership' have been used. Now, an actual partnership exists where two or more persons contribute their property or services to be employed jointly in some enterprise or business, the profits or loss of which is to be shared among them in some fixed proportion. An ostensible partnership, as distinguished from an actual partnership, exists where a person intentionally *or by want of ordinary care* causes a third person to believe that another is his partner, though that other is not in fact such partner. To illustrate, if the defendant Banks, Siverly and E. J. Penfield had contributed their property or services to be employed in the banking busi-

ness jointly, the profit or loss of which was to be shared between them in some fixed proportion, they would have been actual partners. · On the other hand, if the defendants Banks and Siverly, either intentionally or by want of ordinary care, had caused third persons, when acting as persons of ordinary care and prudence, to believe that they were partners of Penfield, then, in such case, they would have become what is termed ostensible partners, even though they were not actual partners.

"VII.   You are instructed that there may be cases in which the holding out has been so public and so long continued that it will be presumed that the party alleged to be a partner must have known that he was being held out as such, and that credit was being obtained on the strength of such holding out.   Thus if, in this case, it has been shown by the evidence that the paper designated in these instructions as Exhibit B was publicly circulated for such a long period of time that Banks and Siverly must have had it brought to their attention, and it does not appear that they made any efforts to contradict the contents of said circular, and it further appears from the evidence that a certain depositor, or certain depositors, acting as reasonably careful and prudent men would have acted under the circumstances, relied on the truth of such contents, and that he or they did in fact rely on the truth of such contents, and that, because of such reliance, he or they placed his or their money in the said bank, and would not have done so but for such reliance, and that by reason of · so depositing his or their money it has been lost to him or them, then, in such case, the defendants or the defendant, as the case may be, would be liable in this action to such depositor or depositors, if he or they had before suit commenced duly assigned his or their claim or claims to the plaintiffs herein, or in some way given them authority to bring suit thereon.   *   *   *

"XI½.  There being no evidence that Banks and Si-
verly ever signed the said circular known as Exhibit B,
it, the said circular, is not to be considered by you as evi-
dence that they were actual partners in the said·bank.  The
circular is not competent for such purpose, because for
such purpose it would be mere hearsay.  It may, however,
be considered by you as evidence that a claim was being
made by *someone* that Banks and Siverly were partners
in said bank, and that such claim was being made .for the
purpose of inducing the people to deal with and to deposit
their money in said bank, and for the purpose of showing,
if it does show, *what it was that induced the said depositors
to deal with the bank,* to rely on its ·solvency and to deposit
their money in the said bank, and it is on such grounds,
and on such grounds only, that said circular was admitted
in evidence in this case.

"XI¾.  Some of the depositors who had never seen
the said circular ·swear that they were orally told of its ex-
istence and what its contents were.  Now, these oral state-
ments made to the depositors are not to be considered by
you as evidence that Siverly and Banks were actual part-
ners in the said bank.  Said ·statements are not compe-.
tent for such purpose, and were not admitted in evidence
for such purpose, because for such purpose they would be
mere hearsay.  These statements were admitted in evidence
for the purpose of showing, if they do show, what it was that
induced the hearers of the statements to deal with the said
bank, and to rely on its solvency, if they did rely, to de-
posit their money therein, and said statements may be con-
sidered by you for such purpose, and for such purpose only."

At the request of the plaintiff, the court further in-
structed the jury as follows:

"C.  You are instructed that, in determining whether
or not the defendant Banks, as a reasonable, prudent man,
knew *or should have known* that people in the town of

Kelley and vicinity would and did deposit their money in said bank in reliance upon his individual responsibility after the issuance and distribution of said circular, you are authorized to consider the knowledge, if any, possessed by said Banks of the financial responsibility of E. J. Penfield, *the relation existing between said Banks and said Penfield,* and the knowledge or belief, if any, that the said Banks had as to the responsibility of the said E. J. Penfield, the number and frequency of his visits to the town of Kelley, *his presence in the bank, on such occasions as you find that he was present in the bank,* the fact, if it be a fact, that the said Banks was told by the said Penfield, if he was told, that the object in issuing the circular was to make the bank appear better, and all other facts and circumstances as disclosed by the evidence.

"D. While a person who is held out by another as a partner in any given enterprise, and who is not in fact a partner therein, is not required to use *strict* diligence to prevent others from extending credit to such enterprise in reliance upon his supposed partnership relation thereto, still, if he knows or has reasonable cause to believe, under the circumstances of the particular case, that others will extend credit to such enterprise in reliance upon his supposed partnership relations thereto, he cannot sit silently and make no denial, and allow such others to extend credit to such enterprise in reliance upon his supposed partnership relation thereto, but is required, as against such others who, in the exercise of reasonable care and diligence, have a right to rely on such supposed partnership relation, and who did rely thereon, *to make denial* of his connection with such enterprise as a partner, and to give such reasonable publicity to such denial as would appear to a reasonably prudent man in such situation should be given under all the circumstances in the particular case, and if he fails to so make denial and so give reasonable publicity to such

denial, he is bound as a partner in said enterprise as to those who, acting as reasonably prudent men, believe him to be a partner therein, and who, under all the circumstances, had, as reasonably prudent men, a right to so believe, and who extended credit to such enterprise in reliance thereon."

The court on its own motion, gave the jury an additional instruction, as follows:

"A.   You are instructed that, before the plaintiffs can recover on any account of their petition in this cause, they must prove by a preponderance of the evidence that the depositor in the bank exercised good faith and used due diligence to know the truth with regard to who were the owners of the Bank of Kelley and who were liable for its debts and obligations, and in this regard you are instructed that, if the evidence in this case shows that circumstances were brought to the notice of such depositors as would excite inquiry in the mind of any prudent man, and the means of satisfying such inquiry were such that a reasonably prudent man would have used the same, but such depositor did not use such means and made no such inquiry, then you are instructed that such a depositor cannot recover against the defendants C. L. Siverly and Henry Banks, but such depositor cannot, under such circumstances, be held to have exercised good faith and to have used due diligence to know the truth as to who were the owners of said bank of Kelley, and in such circumstances, on such count your verdict must be for the defendants."

III.   That there may be circumstances under which a person will be held to liability as a partner though he is not and never has been a partner in fact, will not be denied; but such burden can be imposed upon him only when, by reason of some act or wrong or fault on his own part, he has estopped himself to deny the partnership relation. Before undertaking to consider

3. ESTOPPEL: equitable estoppel: implied fraud: estoppel to deny partnership.

whether this is a case of that character, it may be well to recall some of the established principles of the law of estoppel. Of the several kinds of estoppel recognized by the courts, the one sought to be enforced in this case is to be classified as an equitable estoppel, or estoppel *in pais,* a term applied to a situation where, because of something which he has done or omitted to do, a party is denied the right to plead or prove an otherwise important fact. The naked statement that a party in a court of justice may be properly denied the right to assert or testify to the truth is, at the first blush, somewhat startling, but the rule is one capable of wholesome application when kept within its proper function for the prevention of fraud, actual or constructive. On the other hand, when misapplied, it is a most effective weapon for the accomplishment of injustice. From an early day, the courts were disposed to consider the rule a harsh one, and it was and still is a common expression that "Estoppels are odious." We have ourselves held that "estoppel is not favored in law, and must always be clearly proved." *Baldwin v. Lowe,* 22 Iowa 367. The courts do not hesitate, however, to uphold a claim of estoppel wherever it is essential to prevent fraud. A party may thus estop himself by his spoken or written statements or representations, or by his mere silence when, in equity and good conscience, he ought to speak; but it is not enough to estop him from asserting the truth that he has at some prior time spoken or acted inconsistently therewith. To have that effect, it must clearly appear that, by his statements and representations, or by his silence when, as an honest man, he ought to have spoken, he has misled another to his injury, or has himself thereby acquired an unfair advantage. *Franklin v. Merida,* 35 Cal. 558. For "no party ought to be precluded from making out his case according to its truth, unless by force of some positive principle of

law." *Curtis v. Root*, 20 Ill. 518, 524. Says the New York court:

"An estoppel *in pais* is a moral question. It can only exist where the party is attempting to do that which casuists would decide to be a wrong; something which is against good conscience and honest dealing." *Delaplaine v. Hitchcock*, 6 Hill (N. Y.) 14.

Generally speaking, an estoppel *in pais* is applicable only where the conduct or words of the party estopped are intended to be or are of such character that, under the circumstances shown, they will be presumed to have been intended. to influence the other party to act thereon, and did in fact so influence him. The Supreme Court of the United States, speaking by Field, J., says:

"For the application of that doctrine (equitable estoppel) there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud, by which another has been misled to his injury." *Brant v. Virginia Coal & Iron Co.*, 93 U. S. 326 (23 L. Ed. 927, 929).

The same distinguished jurist quotes approvingly from Judge Story as follows:

"In all this class of cases the doctrine proceeds upon the ground of constructive fraud, * * * or concealment or negligence so gross as to amount to constructive fraud." 1 Story's Equity, Sec. 391. Also, from the Pennsylvania court as follows:

"The primary ground of the doctrine is that it would be a fraud in a party to assert what his previous conduct had denied, when on the faith of that denial others have acted. The element of fraud is essential, either in the intention of the party estopped, or in the effect of the evidence which he attempts to set up." *Hill v. Epley*, 31 Pa. St. 331, 334.

The same doctrine is again announced by the Supreme Court of the United States in *Henshaw v. Bissell*, 85 U. S. 255 (21 L. Ed. 835, 840), where the above quoted definition of equitable estoppel is repeated, following which the court adds:

"An estoppel *in pais* is sometimes said to be a moral question. Certain it is that to the enforcement of an estoppel of this character, such as will prevent a party from asserting his legal rights to property, there must generally be some degree of turpitude in his conduct which has misled others to their injury."

To the same effect, see *Combs v. Cooper*, 5 Minn. 254; Adam's Equity (8th Ed.), pages 150, 151; *Viele v. Judson*, 82 N. Y. 32; *Andrews v. Lyons*, 93 Mass. 349, 350; *Boggs v. Merced Mining Co.*, 14 Cal. 279, 366; *Taylor v. Ely*, 25 Conn. 250; *Trenton v. Duncan*, 86 N. Y. 221.

Such, also, is the repeated holding of this court. For example, we have said:

"The facts in cases of this kind, to be sufficient to justify the application of the law of estoppel, always involve bad faith on the part of the party sought to be estopped from showing the truth." *Laub v. Trowbridge*, 71 Iowa 400.

Again:

"The doctrine of estoppel *in pais* is based upon a fraudulent purpose or fraudulent result. If the element of fraud is wanting, there is no estoppel, as where both parties were equally cognizant of the facts, and the declaration or silence of the one party produced no change in the conduct of the other. There must be deception and change of conduct in consequence." *Garretson v. Equitable Mut. L. & E. Assn.*, 93 Iowa 402, 411.

Again:

"Perhaps as clear a statement of what is an estoppel by acts and declarations as can be found is in Bouvier's

Law Dictionary 541. It is as follows: 'Such as arises from the acts and declarations of a person by which he *designed-ly* induces another to alter his position injuriously to himself.'" *Wishard v. McNeill*, 85 Iowa 474, 479.

And again:

"An estoppel *in pais* is based on fraud, and the conduct relied upon to establish it must be such as to amount to fraud, actual or constructive. * * * There can be no estoppel by silence unless there is a duty to speak." *Beechley v. Beechley*, 134 Iowa 82.

This is not to deny that an estoppel may arise where there is no affirmative evidence of wrongful design or fraudulent purpose, but in such cases, it must appear that the conduct complained of was so grossly negligent, or of a character so manifestly misleading to others, that it would be tantamount to a fraud to permit the party to escape liability to those who, in the exercise of reasonable care and diligence on their own part, have been thus misled to their injury.

There is another class of cases sometimes spoken of as coming within the same exception, as, for example, where declarations are honestly made, with knowledge or expectation that another will act upon them or be influenced thereby, and it later appears that the person making them was mistaken as to the facts, and that another has been thereby influenced to his injury. Such situation, however, falls not so much within the technical scope of the law of estoppel as of that other familiar rule or maxim, that, where loss or damage must fall upon one of two parties, both innocent of any actual or constructive wrong with respect thereto, it ought to be borne by the one by whose mistake the other has been misled.

We have indulged in this somewhat ex-

**4. ESTOPPEL: eq-** tended consideration of the law of estoppel
**uitable estoppel:**
**silence: duty** *in pais* because we think that a proper con-
**to speak.**
ception of the subject, as applied to the pe-
culiar circumstances of the present case, is requisite to a
proper review of the rulings made and instructions given
on the trial below.   Examinations of the precedents show
that, in general, the claim of an estoppel *in pais* is based
upon alleged positive acts, declarations, statements or ad-
missions by the party sought to be charged; or upon the
alleged silence of such party under circumstances in which,
as an honest man, with due regard for the rights of others,
he was in duty bound to speak.   It is manifest that cases
of the first description are the more easy of solution, for
statements, declarations and admissions are matters capa-
ble of direct proof, and their meaning and effect may be as-
certained by application of the ordinary rules of construc-
tion.   But when the party is sought to be charged simply
because he was silent, or because he has done nothing, or
because he did not do as much as in equity and good con-
science he was bound to do, the party claiming the estoppel
assumes a more difficult burden.   The case before us is of
this latter class.   It is the plaintiff's claim that, when ap-
pellant heard that his name had been used by Penfield in
an unauthorized manner, he was in duty bound to repudiate
it promptly, and in such manner that depositors and oth-
ers doing business with the bank should be made to under-
stand that he had no connection therewith; and that, fail-
ing so to do, plaintiffs and those whom they represent
were led to patronize the bank to their injury.   This re-
quires the court and jury to consider when, if at all, the
appellant became bound to speak; to whom he should have
spoken; in what manner he was required to make denial
and repudiation of the alleged partnership; and whether
he was bound to diligence to know that his name was being

used without his authority, or to ascertain whether anyone was being misled thereby; and finally, whether, in view of all the facts, his conduct in these respects was marked by fraud or want of good faith, or by such clear disregard of his duty in the premises as to be tantamount to fraud. If these inquiries be answered against the appellant, it is further necessary, before he be adjudged liable for the debts of the partnership with which he had no connection, that inquiry be made as to what notice or knowledge, if any, the complaining depositors had of the use of appellant's name by Penfield; of what effort or inquiry, if any, they made to know the truth of such holding out by Penfield; what reasons, if any, they had to assume or believe his legal liability for their deposits; whether they did in fact rely thereon in making such deposits; and how long after the unauthorized use of appellant's name had ceased they can be heard to say they continued to rely thereon.

IV.   Much evidence was introduced
5. PARTNERSHIP: the relation: third persons: "holding out:" evidence: reputation. to show an alleged general reputation that appellant was a partner in the bank. The fifth paragraph of the court's charge, already quoted, informed the jury that such testimony was not to be considered as showing an actual partnership, but was competent to prove the depositor's belief that there was a partnership, and his reliance thereon.   In that same connection, the jury was further told that one may become liable as an ostensible partner if such general reputation of a partnership "has been so persistent and so long continued *as to raise the presumption that he is in fact a partner,* and he has knowledge of such general reputation, or *as an ordinarily careful and prudent man should have knowledge of such general reputation, but makes no attempt to contradict or deny the fact* of partnership, and others are by such general reputation led to believe that he is a partner, and acting on such belief, and

by reason thereof, are induced to extend credit and are damaged thereby."

In our judgment, this instruction cannot be approved. The initial proposition that an actual partnership cannot be established by general reputation is, of course, correct, and has the support of nearly all the authorities; but the remainder of the paragraph, which is, in effect, an instruction that an ostensible partnership may be established by such testimony, is unsustainable, upon principle or well-considered precedent. It includes in its statement the further assumption that such general reputation that he is a partner may be so persistent and so long continued "as to raise the presumption that he is in fact a partner;" and this, if we understand the meaning and force of the language employed, is wholly at variance with the correct rule which the court had just announced as to the incompetency of reputation in proof of an alleged partnership relation. No presumption of partnership can arise from reputation alone, however long continued. It is true, as we shall have occasion to note, that reputation is a question which plays a larger part in the matter of an alleged ostensible partnership than in an actual partnership; but, barring an occasional loose or inapt expression to be found in a few decisions, the rule that a partnership is not to be proved by current gossip or vague general understanding is applicable to all partnerships, whether actual or ostensible. Were the partnership in this case actual, plaintiffs would be under no necessity of proving reliance thereon in suing for a recovery of their deposits. In such case, their proof need go no further than to prove the fact of their deposits, and that they are still unpaid. But where they seek to recover on the theory that, although the person charged is not a partner in fact, yet he has by his own representations estopped himself as against them from denying the partnership relation, they must not only prove the matter which so estops him, but

go further, and prove that they relied thereon in making their deposits. It is upon the latter element in their case, and upon this only, that testimony of the general repu-, tation of the existence of a partnership is admissible. *Brown v. Crandall,* 11 Conn. 92; *Bowen v. Rutherford,* 60 Ill. 41; *Bryden v. Taylor,* 2 Har. & J. (Md.) 396; 2 Wigmore's Evidence, Sec. 1624. Two or three cases may be found where evidence of reputation of partnership is held admissible if it further appear that such reputation has arisen or grown out of the acts or declarations of the person sought to be charged as a partner. For example, see *Gilpin v. Temple,* 4 Harr. (Del.) 190. But to allow one person who desires to improve his appearance of credit to circulate without authority a report that some other person is his partner, and thereby create or give rise to a reputation of the existence of such partnership relation, and then hold that such reputation may be put in evidence to prove its own truth, would assuredly not appeal to one's natural sense of justice, nor have tendency to enhance one's respect for the law. Says the Connecticut court, in *Brown v. Crandall,* supra, to admit such evidence would be to open the door to fraud; for a trader in poor credit would be tempted to circulate the rumor that a man of wealth was a member of his firm in order to help his credit, and his creditors would be tempted to further it so that they might collect their debts. See, to like effect, *Brown v. Rains,* 53 Iowa 81, 82.

There would seem to be enough in the undisputed evidence in this case to emphasize the truth and justice of the expression just quoted; for it is shown that plaintiffs, without exception, base their alleged belief that defendant was a partner in the bank solely upon the printed circular which they saw, or of which they had more or less remotely heard, and it is further shown without dispute that

the circular was prepared and issued by Penfield alone, without the knowledge or consent of the appellant.

Proceeding then, to the remaining por-
**6. PARTNERSHIP:**
**the relation:**
**evidence: gen-**
**eral reputation.** tion of the fifth paragraph of the charge to the jury, we do not overlook the fact that the court, in stating the condition of appellant's liability, follows up the language to which we have adverted, as follows: "And he has knowledge of such general reputation, or as an ordinarily careful and prudent man should have knowledge" of it. This proposition is open to very material objections. In the first place, there is not a word in the evidence upon which the jury could properly find that the existence of such rumor or story or reputation was ever brought to the notice or knowledge of the appellant, and the instruction is, to that extent, without basis in the record. If, in any case, general reputation may have the force of notice to a person affected thereby, such rule must in reason apply only to those who are living or doing business in the community where the reputation prevails, and where it may reasonably be presumed that the matter would have come to their attention. To extend this rule beyond these bounds would be to expose every man to danger of financial ruin at the hands of conscienceless adventurers. Appellant did not live in Kelley. His neighborhood was tributary to Ames, and not Kelley. His visits to Kelley were occasional only. Not one of the depositors ever spoke to appellant concerning the bank or his alleged connection with it, and, if these people so peculiarly interested in the subject did not mention it to him, there is no room for any presumption or inference that any other person did. But the even more vital objection at this point is in the further in-
**7. PARTNERSHIP:**
**the relation:**
**evidence: rep-**
**utation:**
**knowledge.** struction that appellant may be charged with liability if, as a careful and prudent man, he ought to have known of the alleged reputation and did not contradict it. The

effect of this is to hold that he was under a legal duty to exercise some degree of diligence to discover or to know the existence of floating rumor or gossip or general repute in and about the town of Kelley connecting him with the bank at that place, and, having discovered it, to enter some kind of a denial. We feel very certain there is no such rule of law, and that a precedent to such effect ought not to be established. *Gaffney v. Hoyt*, 2 Idaho 199; *Campbell v. Hastings*, 29 Ark. 512; *Cole v. Butler*, 24 Mo. App. 76. No man is to be held responsible for the truth or falsity of a current report or reputation concerning himself or his business, unless he has given rise thereto by his own conduct, or the existence thereof has been brought to his knowledge in such manner that, in equity and good conscience, he should meet it with a denial. Having no actual knowledge of such report or reputation, he is under no duty to inquire or investigate whether anything of that kind is afloat in the community, and, if in fact ignorant thereof, he cannot be held to liability as for the truth of the report, on the theory that he ought to have known it. Few people would have time for anything else if they were legally bound to inquire what others were saying about them, or about their business enterprises and relations, in order to protect themselves against being estopped to deny the verity of a reputation so made.

The appellant's assignment of error upon the giving of the fifth instruction to the jury must be sustained.

V. The appellant also challenges the correctness of the instruction numbered XI½. In this, as we have seen, the jury was told that, while the printed circular was not competent evidence that appellant was an actual partner in the bank, yet it could properly be considered "as evidence that a claim was being made by someone" that he was a partner therein,

8. TRIAL: instructions: form, requisites and sufficiency: implied license to consider incompetent testimony.

"and that such claim was being made to induce people" to patronize the bank, and "for the purpose of showing, if it does show, what it was that induced the depositors to deal with the bank and rely on its solvency." In Paragraph XI¾, a similar rule is stated as to the use of the testimony of depositors who never saw the circular, and knew nothing of it except what they had been told by others. Referring to the first of these paragraphs, it may be said, as before intimated, that, had there been any other and independent evidence that plaintiff had held himself out as a partner, or had knowingly permitted himself to be so held out by Penfield (a state of facts which is not shown), then proof that depositors had seen the circular before entrusting their money to the bank would, under the rule of many of the cases, be admissible as tending to support their claim, not of a partnership of any kind, but of their belief of a partnership and their reliance thereon. Proof of this fact alone would not, however, sustain the finding of an estoppel, for the belief and reliance of the party is but one of the elements of estoppel. In both paragraphs, the court limits the incompetency of the testimony to the claim of an "actual partnership," and we think the jury would be apt to infer, from this emphasizing of the word "actual," that such evidence was competent for consideration upon the question of an ostensible partnership, though this is not expressly stated in the instruction, and doubtless was not so intended by the court. Whether the testimony referred to in Instruction No. XI¾, of depositors who knew nothing of the circular except what they had been told by others, is competent for any purpose, is very doubtful, especially under the record made in the present case. Each and every depositor testifying expressly states that his belief or faith in the existence of a partnership was based on the printed circular alone. None of them claims to have knowledge of any act or word on the part of appellant holding

himself out as a partner in the bank, and none of them
claims to have known whether appellant was or was not
aware of the use which Penfield had made of his name.
The most they say which in any manner hinges upon the
conduct of appellant is that, if he had reported to them
that he was not a partner, they would not have given cred-
it to the bank; and yet none of them at any time gave him
the opportunity to admit or deny his alleged interest in the
business. This phase of the case will arise again in our
consideration of other exceptions argued by counsel, and
we pass it for the present without further discussion.

VI. In the instruction marked "C,"
9. PARTNERSHIP: the court called the attention of the jury to
the relation:
quasi partner-    certain circumstances which could be con-
ship: evidence:
sufficiency.      sidered as tending to show that appellant
ought to have known that the "people of
Kelley and vicinity" would and did deposit money in the
bank relying upon his individual responsibility, and men-
tioned the following: (1) The relationship between Banks
and Penfield; (2) his knowledge or belief as to the respon-
sibility of Penfield; (3) his visits to Kelley and his pres-
ence in the bank; and (4) the fact, if it be true, that he
was told by Penfield that the purpose of issuing the cir-
cular was to make the bank appear better.

It has quite frequently been said to be an undesirable
practice for a trial court to select one or a few matters
of evidence for special reference in its charge to the jury,
as it tends to give to such items undue importance in the
minds of the jurors, who are apt to assume therefrom, that,
in the mind of the court, such evidence is decisive of the
case. We have to express our doubt also whether the fact
that Penfield's wife was the daughter of the appellant can
properly be considered as having any tendency to sug-
gest to his mind that the people of Kelley were depositing
money in Penfield's bank "in reliance upon his (appel-

lant's) individual responsibility," or that any such effect would follow from his knowledge, if any, of the financial soundness of Penfield. Nor do we believe that the evidence of appellant's visits to the bank tended in any degree to indicate to the mind of any reasonable person that he was in any manner connected therewith. The witnesses are agreed that his calls at the bank were brief and infrequent, and at no time has anyone seen or known of his having any hand in its business. After the easy and informal manner of small country banks, the space back of the counter was a resting or loafing place, the convenience and warmth of which attracted many of the callers, and appellant's calls or visits there are not shown to have differed in any manner from those which were made by many others. His testimony that he never at any time had anything to do with the bank or patronized it in any way is corroborated without exception by the several cashiers, clerks and assistants in its employ from time to time throughout the history of Penfield's connection therewith, and, in our judgment, the jury should not be allowed to draw therefrom any inference that he was thereby giving any ground for the belief by the patrons of the bank in general that he was a partner or owner, or liable for the bank's debts.

VII. The appellant requested the court to instruct the jury that, before plaintiff could assert an estoppel against defendant's denial of liability for the debts of the bank, because of the circular issued by Penfield, or because appellant did not exercise due diligence to deny it, the depositors must themselves have exercised reasonable care and good faith to discover the authenticity of the circular; and if they could, easily and with slight effort or expense, have learned the truth from the appellant, or have called upon him to affirm or deny his liability as a

10. ESTOPPEL: equitable estoppel: diligence to learn the truth.

partner, and did not do so, and they neglected or failed to use such means of obtaining knowledge, they were not entitled to recover. The court refused the request, but on its own motion gave the instruction which we have already quoted as No. A. This, it will be seen, states the duty of reasonable care and diligence of the depositors in general terms, qualifying it, however, by the statement, in substance, that plaintiffs might be chargeable with negligence if it should be shown "that circumstances were brought to their notice such as would excite inquiry in the mind of any prudent man, and the means of satisfying such inquiry were such as any reasonably prudent man would have used," and they failed to avail themselves of such means of information, and that then they could not recover in this action.

Had the jury given careful heed to the instruction, even as given by the court, we are of the opinion that a verdict for the defendant was inevitable; but we are disposed to hold that the qualifications so made of the obligation upon plaintiffs to exercise diligence to know the truth of the printed document upon which they relied, render it less favorable to the defendant than he was entitled to. The bank was being conducted by Penfield under the business name which he had used from the outset. There was no act or representation by appellant indicating that he had any interest therein. To charge him as an ostensible partner in a business so conducted, persons crediting the bank on such supposition must show affirmatively that they exercised the care and caution of reasonable men to know the truth in regard to the alleged partnership, and that they were in some manner misled by his act or fault. It does not lie in their mouths to say that appellant should have come to them and informed them that he was in no manner responsible for the debts of the bank with which he had no connection, if they did not exercise any care to

know the truth of Penfield's representations, or of the reports or reputation on which they claim to have relied. Says the Illinois court, in speaking of an alleged estoppel of this kind:

"Creditors, by ordinary caution and inquiry, can protect themselves from imposition. They need not part with money or goods until they ascertain the fact of partnership, or the joint liability of the persons to whom the credit is given." *Bowen v. Rutherford,* 60 Ill. 43.

In *Cook v. Penrhyn Slate Co.,* 36 Ohio State 135, where it was sought to impose the liability of a partner upon one who was not in fact a member of the firm, because of certain mercantile reports on which the plaintiff relied, the court says:

"There is nothing in the evidence to show that defendant authorized these reports or was in any way connected with them. They cannot, therefore, be used to charge him with liability. * * * If he (plaintiff) was ignorant of whom the firm was composed, his duty was to make inquiry of those he was about to credit, and not of strangers."

In *Davidson v. Jennings,* 27 Colo. 187, it is said that, to entitle a party to invoke the doctrine of estoppel *in pais,* he "must actually have been misled and induced to act to his prejudice by reason of another's conduct, he having on his part exercised due diligence to ascertain the truth."

Upon the same subject it has elsewhere been said:

"If he was not so misled, * * * and with a reasonable use of means within his reach he might have ascertained the fact, he could not set up an estoppel. * * * The party setting up an estoppel is himself bound to the exercise of good faith and due diligence to ascertain the truth." *Moore v. Bowman,* 47 N. H. 494.

In another case of alleged ostensible partnership:

"It is not enough to show that he was represented by

others to be a partner, or that his name appeared in the firm; it must be shown that he knew he was being held out as a partner and that he assented thereto, or facts from which assent can be fairly implied.  *  *  *  A party setting up an estoppel by conduct is bound to the exercise of good faith and due diligence to know the truth." *Morgan v. Farrel*, 58 Conn. 413; *Atkinson v. Plum*, 50 W. Va. 104 (58 L. R. A. 788, 803). See, also, Bigelow on Estoppel (1st Ed.), 480. In 11 Am. & Eng. Ency. of Law, at page 434, the authorities are quite fully gathered, and, speaking therefrom, the author of the article says:

"It may be stated as a general rule that it is essential to the application of equitable estoppel that the party claiming to have been influenced by the conduct or declarations of another to his injury was himself not only destitute of knowledge of the state of the facts but was also destitute of any convenient means of acquiring such knowledge; and that, where the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel." See, also, *Boggs v. Merced Mining Co.*, 14 Cal. 279, 368; *Whitaker v. Williams*, 20 Conn. 98, 104; 1 Story's Equity Juris., Sec. 391.

Applying this rule to the case before us, we are of the opinion that the jury should have been explicitly told that if, at and before the time the depositors put their money in the bank, on the alleged belief that appellant was a partner therein and on faith of his responsibility for its debts, they could easily and conveniently have ascertained the truth in this respect from the appellant, or otherwise, and failed to do so, then no estoppel arose in their favor, and they could not recover. It is true that a careful reading of the instructions in this respect, as given by the court, would, or ought to, have led the jurors to this conclusion; but the result of the trial demonstrates that they did not so understand it. As witnesses, the depositors

without exception state that their belief of appellant's partnership in the bank was based, not on anything they knew or had seen in the conduct of the appellant, but on what they had seen or heard from others of the printed booklet issued in the summer or fall of 1907. Each of them knew appellant personally, meeting him from time to time during all the 3½ years intervening between that date and the collapse of the bank, yet none of them was sufficiently solicitous about the matter to mention it to him or make inquiry of him concerning it, until Penfield, who conducted the bank, and to whom they had entrusted their money, absconded. No witness undertakes to say that, in conversation or dealing with him or in his presence, appellant ever held himself out as a partner. The holding out by means of the circular was by Penfield alone, and, if the appellant is to be held liable at all, it is because he, in some way, expressly or impliedly, assented to or ratified the act of Penfield. Appellees do not claim that they have any evidence of an express assent or ratification on his part, but rest their case solely upon the proposition that he did not give sufficient publicity to his repudiation of Penfield's unauthorized act, and thereby they were deceived into the belief that he was a partner in fact, and thus led to give credit to the bank. There is, therefore, neither wrong nor hardship in requiring them to show that they exercised reasonable care to know the truth. To quote again the language of the Ohio court in a similar case, if the creditor was "ignorant of whom the firm was composed, his duty was to make inquiry of those whom he was about to credit, and not of strangers." *Cook v. Penrhyn Slate Co.,* supra. See, also, our recent case, *Farmers' Exch. Bank v. McDonald,* 167 Iowa 582, 590.

VIII. Passing other portions of the court's charge of which complaint is made, we take up the exceptions to rulings on evidence. These are very numerous, and we shall

be compelled to omit discussion of many, combining them as well as we may under a few general heads.

The first question thus raised has reference to the admissibility of the circular, Exhibit B, with proof that it was issued from the bank in August or September, 1907, and that it was then seen or received by several of the depositors interested in this suit, and that they believed and relied upon its·authenticity. The court quite consistently overruled these objections, on the theory that the testimony was competent in so far as it tended to show what these depositors relied upon in giving credit to the bank. As thus restricted, the ruling, for reasons already indicated, is not vulnerable to the appellant's objection.

11. PARTNERSHIP:
the relation:
partnership
by estoppel:
evidence.

A more doubtful question arises upon the ruling admitting testimony of those who had not seen the circular, as to what they had heard about it and how this information had influenced their minds. Examples of these rulings will be seen by reference to the extracts from the record, found in the second paragraph of this opinion. To illustrate, the following questions were allowed, over appropriate objections: "State whether you heard of a statement issued by the Bank of Kelley in the fall of 1907 concerning its responsibility." "What were you told the circular stated as to the owners of the bank?" "Did you ever hear about the circular being issued?" Many other inquiries of the same general import were permitted, and in answer thereto, witnesses swore that they had heard of it; but few, if any, were.able to state with any clearness where they got their information. Some of them were not living in Kelley at the time, and the story did not come to their ears until from one to three years subsequent to the appearance and use of the circular. In most cases, the

12. PARTNERSHIP:
the relation:
partnership
by estoppel:
hearsay.

origin of this information was, for the greater part, "they said," "they told me," "I heard it talked,"—the usual form in which a vague rumor finds its way from mouth to mouth, and always quite untraceable to any responsible source. That there are circumstances under which general reputation concerning certain matters may be put in evidence as bearing upon the question of notice, or the reasonableness of one's belief in the existence of a given fact, need not here be denied, but no rule is better settled than that rumor and hearsay are not evidence to prove a contract right or a cause of action, and, for even better reason, it is wholly incompetent to prove an essential element constituting an estoppel. So far as the appellant is concerned, the circular issued by Penfield was, at the best, clearly hearsay, and what the witnesses who had never seen the paper had to say about it was hearsay derived from still other hearsay. The danger of unduly extending the exceptions to the rule which excludes such evidence is too clear for controversy. The court, in overruling the objections to questions of this kind, while conceding the hearsay character of the testimony, said it would be received "in so far as it affected the mind and act of the witness." But is that a sound reason for the ruling? The mind of the witness may have been affected or influenced by an infinite variety of circumstances, for none of which the appellant was in the remotest degree responsible, and to put them in evidence would bring us no nearer the solution of the issue being tried, but would undoubtedly tend to cloud the real issues and confuse and mislead the jury. We do not forget what we have repeatedly conceded: that an estoppel *in pais* may be established by proof either of an act or representation or culpable silence of the party to be charged, whereby the party claiming the estoppel has been misled to his injury, and where it would operate as a fraud to permit the former to deny the truth of that which he induced the other party to be-

lieve. But proof of what influenced the plaintiff's act would be wholly immaterial, unless the fact or thing sought to be shown is something for which the appellant is in some way responsible. As applied to this case, it must first be shown that the circulation of the story of an actual or ostensible partnership was chargeable to the act or culpable negligence of the appellant, and we have grave doubts whether such a case was made. Indeed, the great mass of the testimony was so largely devoted to proving the issuance of the circular and the reputation or belief existing in Kelley, and in the minds of the depositors, of appellant's interest in the bank, that it is difficult to avoid the conviction that the jury must have become impressed with the thought that these were of paramount consideration in determining plaintiffs' right of recovery. In our judgment, the door in this direction was opened too wide, and much which was clearly hearsay admitted without connecting the same with any culpable act or omission on part of the appellant, to make it competent for any purpose.

IX. The appellant requested the court to instruct the jury peremptorily to return a verdict in his favor, because of the insufficiency of the evidence to justify a verdict against him. The request was denied, and error is assigned thereon. The point is made by appellees that, if there was any error in this ruling, the appellant waived it by his own requests for instructions to the jury. Assuming that the point is well made, we are of the view that, as the case must be reversed on other grounds, and the issues may come on for trial anew, it is proper for us to express ourselves on a certain phase of the law not yet considered, except incidentally, but which will necessarily come up for consideration on a retrial.

As noted by us at the outset, there was

**13. PARTNERSHIP: the relation: partnership by estoppel: burden of proof.** a manifest failure to prove anything like an actual partnership. It is equally clear and undisputed that appellant at no time or place held himself out as a partner therein. That he was so held out by Penfield in the printed circular is true. To bind the appellant by this act, the burden is upon the plaintiffs to show that he assented to or ratified such act of holding out, or that he, by negligence so gross as to be tantamount to fraud, permitted such holding out to go on, and the depositors in the bank to be deceived thereby. The burden is upon the appellees to show facts of this character, and if they do not, their case fails. It is not argued that evidence of any positive act or word of acquiescence in or approval by appellant of Penfield's act was produced on the trial below, but the right to recovery is staked solely on the proposition that, when he was so held out as a partner by Penfield, he was in duty bound to do something to prevent the customers of the bank from being misled in the matter, and that, in this respect, appellant failed in his duty, and the depositors were thereby deceived. Upon the general principle of law so advanced there need be no controversy; and the dominant issue in the case is whether appellant was in fact advised of the action of Penfield, and if so, whether, as an honest man, upon such information as he had, he ought to have done more than he did do to put an end to the misrepresentation and prevent the depositors from being thereby deceived. It will be remembered that the evidence is without dispute that the appellant did not see the circular until this suit was in progress, and that his only knowledge of its existence or use was from a statement made to him by a nephew that he (the nephew) had heard there was a paper of some kind out in which the appellant was named as a partner or stockholder in the bank. Immediately upon re-

ceiving this information, he went to the bank, and, Penfield being absent, addressed the cashier, protesting against the use of his name, and was told that the matter would be rectified as soon as Penfield returned. On the third day, he saw Penfield in person, and, upon his demand for an explanation, was assured by him that the matter would be "straightened right up," and that the unauthorized use of his name would not be repeated—a promise which the record tends to show was kept; for, as we have said, none of the witnesses who received the circular or saw it in circulation fix the time at any later date than in the summer or fall of 1907. Just how long the circular had been out before appellant heard of it and disaffirmed it, as above stated, is not clear; but, according to the testimony of the cashier, who was in the best position to know, it must have been a very short time, and not to exceed a few days. After appellant's visit to the bank in this connection, he also saw the elder Penfield, whose name had also been used by the bank, and was told by him that he had consulted counsel, and that appellant need not bother any more about it. From this time on until the bank was closed, 3½ years later, he swears—and no one contradicts him—that he received no notice or information that he was being held out as a partner in the bank; and indeed there is no evidence that, during that period, he was in fact so held out by Penfield or anyone else. Nor is there any evidence that he was informed by anyone, or had information from any source, that "in Kelley and vicinity" he was reputed to be a partner in the bank, or that he was so regarded and relied upon by the depositors. Upon a record like this, would the jury be justified in finding that the appellant was guilty of such gross or wilful disregard of his duty as an honest man that he should be held to have forfeited his right to deny the alleged partnership? What more could he have done than he in fact did? Counsel do

not suggest, nor does the court in its instructions, what other or alternative expedients he might have employed to prevent further mischief on account of Penfield's wrong. Having gone to the source of the misrepresentation and forbidden the use of his name in that connection, and receiving assurance that his protest would be regarded,—as indeed it appears to have been,—did good faith require him to stand at the door of the bank and give personal notice to its customers? Should he have resorted to the newspapers? If so, then, as no paper was published in Kelley, where was he to go? Should he have notified the depositors and other patrons or prospective patrons of the bank in person? It does not appear that he knew who was doing business with the bank, and therefore likely to be deceived by the circular. It would seem to be a fair proposition, both of law and good morals, that if, on receiving notice of the misuse of his name, he at once put a stop to it, his responsibility therefor was at an end, unless possibly he should be held to the exercise of reasonable care to prevent a repetition of the misrepresentation.

The authorities cited by the appellee to the effect that one who holds himself out to be a partner becomes liable as such, to one who credits the supposed partnership on the faith of such representation, are not in point, for the very good reason that there is no pretense in evidence that appellant ever held himself out as a partner in the bank. So, too, of the authorities for the proposition that like consequences obtain where a party has permitted himself to be held out as a partner, and credit is thereby obtained for the alleged firm; for it is here conclusively shown that Penfield's act was not only without the appellant's knowledge or authority, but was promptly repudiated by him. The case of *Smith v. Hill*, 45 Vermont 90, on which reliance is placed, is in marked contrast with the one before us. In that case, the defendant was informed that one Harring-

ton was holding him out as a partner in the staging business under the name of Hill & Co., and, instead of forbidding it, simply said to Harrington, "You must not use that name to hurt me." This, the court very properly interpreted as an acquiescence by Hill in the use of his name, on Harrington's assurance that he would save him harmless. The opinion, holding him liable on a note given in the name of Hill & Co., says:

"The risk of Harrington's neglect to redeem this pledge was upon Hill, and not upon those to whom Harrington should * * * thus pledge the credit of Hill."

That this holding is not a precedent for plaintiffs in the instant case is too clear for argument. Many other authorities stating the rule most nearly in accord with plaintiff's contention are cases in which a partner retires from a firm, but, failing to give notice thereof, is held liable to creditors who continued thereafter to deal with such firm, not knowing that his relation therewith had been severed. It seems to be as clear as it is reasonable that the duty resting upon a partner in fact to give notice of his withdrawal from a firm is much more imperative than is the duty of one who has been held out as a partner without his authority or consent to give notice to the world of his denial of that relation. *Culligan v. Alpern,* (Mich.) 125 N. W. 20; *Southwick v. McGovern,* 28 Iowa 533. So, too, in *Fletcher v. Pullen,* 70 Md. 205, also cited by appellee, where the court held that the question of an ostensible partnership was properly left to the jury, it appeared not only that the alleged partnership was regularly advertised in two local papers, but also that defendant was a subscriber, regularly receiving both papers. There was, moreover, other proof that he had actual knowledge of the advertisements while they were being published, but he took no step to deny their authority. Under such circumstances, the propriety of submitting the issue to the jury is very

manifest; but the facts we have here to deal with are so widely different that the decision is of little value as a precedent in disposing of this appeal. More nearly in point upon the principle involved, though dissimilar in its facts, is *Downie v. Savage,* (Wash.) 129 Pac. 1096. There had been a partnership between Charles G. Savage and a brother, under the name of Savage Brothers. The last-mentioned brother died, and a third brother, Howard, took over the firm business and continued it in the same name, Savage Brothers. It was quite generally supposed that Howard and Charles constituted the firm, although Howard alone appeared in its conduct and management. Of the record made, the court says:

"While there is ample evidence in the record to establish the fact that many persons, including appellant and other creditors, * * * regarded and generally understood the brothers were partners, we can find no instance in the record where any holding out of the existence of such a relation was done by Charles, or with his assent, express or implied. * * * It also appears that mail came to the camp addressed to 'Savage Brothers,' and that Charles knew of such fact, and that he also knew that supplies came to the camp with a like direction. From this it is urged that it must be held there was an implied, if not an express, holding out. It does not appear to us, however, that this can be taken for anything more than a consent on the part of Charles that Howard might do business under the name and style of 'Savage Brothers,' which fact alone we do not think is sufficient to indicate that Charles was a partner, until he did something or said something that would indicate to others he was to be so regarded, especially in view of the undisputed fact that at the mill and in the camp where these creditors were employed, Charles never assumed to act as a proprietor, gave orders, nor took charge as such."

This holding is followed by these remarks, which are very applicable to the case at bar:

"Nor did any of these creditors ever address him as a partner, make inquiries of him as such, nor when they failed to receive their wages, and thus knew of the failure of the business, did they make any demand on him for payment, nor in any way treat him as having any responsibility in the matter. To all intents and purposes, notwithstanding they now say they regarded him as a partner, they then did nothing nor said anything that would indicate such an understanding on their part."

The facts there held insufficient to sustain a finding of ostensible partnership will be seen to be much more persuasive and formidable than those on which it is here sought to sustain such a · conclusion. In *Munton v. Rutherford*, 121 Mich. 418, someone without authority caused it to be published in a local newspaper that the defendant, Mrs. Rutherford, had entered into a partnership with one Beckwith. On learning of it, Mrs. Rutherford went to Beckwith about it and asked that he contradict it. No denial was published, but Beckwith sent out a circular saying that he would continue to conduct business under the firm name of Beckwith & Co. Later, Mrs. Rutherford was sued upon a debt contracted by Beckwith & Co., and it was insisted that her failure to publish a denial of the newspaper item estopped her to deny her partnership in the firm. The trial court instructed the jury on that theory. On appeal, this was held error, the court saying:

"Mrs. Rutherford was under no legal or moral obligation to publish a denial of this newspaper story. Anyone who saw fit to deal with Mr. Beckwith, relying on this item, did so at his peril. If she had been shown the article, had assented to it, and credit had been given her on the strength of such assent, the rule of estoppel would have applied. There being no evidence that she authorized or

assented to it, there is no room for the application of the rule."

Quite directly in point, also, is *Rittenhouse v. Leigh,* 57 Miss. 697, where it is held that, if a person who is falsely held out as a partner by another at once disaffirms and forbids it, and does not thereafter know that such prohibition has been disregarded, he is not estopped to deny the partnership. See, also, *Rouss v. Racket Store,* (Ariz.) 164 Pac. 1182. In a recent case of our own, the general doctrine of estoppel upon an issue of alleged partnership has been quite fully discussed. *Farmers' Exch. Bank v. McDonald,* 167 Iowa 582. There, Finley McDonald, Sr., and his son John kept deposits in the same bank. John McDonald made deposits in the name of Finley McDonald & Sons, while Finley McDonald made deposits in his own individual name. In settlement of overdrafts in the former account, John McDonald gave promissory notes, signed "Finley McDonald & Sons." There was evidence tending to show that the notes, or some of them, were made in the presence of the father. There was evidence that the father said to an officer of the bank, when questioned about John's transactions, "whatever John did was all right;" but he at no time said to anyone that he was a partner with John, nor was it expressly shown that he knew that John was using the name of Finley McDonald & Sons. In holding that no partnership liability was shown, the court, speaking by Gaynor, J., says that one cannot be held liable as a partner by estoppel—

"Where, from the facts and circumstances within his knowledge * * * he (the creditor) had no reason to believe that the party sought to be charged was in fact a partner at the time of the transaction; * * * Belief, to justify an estoppel, must be founded upon facts and circumstances known to the creditor at the time; that supposing him to be a man of ordinary prudence and judg-

ment was sufficient to justify that belief. * * * Where one is sought to be held as a partner on the ground that he held himself out as such, it must appear not only that he held himself out as a partner, but that the other, in good faith, believed him to be a partner, * * * but the belief must be induced by the conduct of the party sought to be charged. He cannot be held liable as a partner because held out to be such by others, unless it affirmatively appears that such was done with his knowledge or consent or concurrence, or by silence amounting to acquiescence."

And it is there further said, as to a creditor invoking an estoppel and "thereby enforcing a liability which would not exist except for the estoppel, it must appear that he exercised due diligence in ascertaining the truth of the facts upon which he predicates" it. The application of these rules to the present case is obvious.

The tedious length to which this opinion has already been drawn out forbids further review of the authorities or consideration of several of the minor propositions argued by counsel, and we conclude the decision by adding the following citation of authorities bearing very directly upon the question as to when a party who is guilty of no wrong on his part must speak or act for the protection of others, at the peril of estoppel against himself: *Hunt v. Reilly*, 24 R. I. 68; *Viele v. Judson*, 82 N. Y. 32, 41; *Williamson v. Jones*, 43 W. Va. 562; Bigelow on Estoppel (6th Ed.), 661, 662; *Hollins v. Hubbard*, 165 N. Y. 534; *Collier v. Miller*, 137 N. Y. 332.

No man should be put to the hazard of being stripped of his earthly substance to satisfy a debt contracted by another without his authority and without his knowledge, and without the slightest consideration moving to him, except upon clear and satisfactory showing of facts and circumstances which in all good conscience should close his mouth to a denial of his liability therefor. We have said that the

doctrine of estoppel *in pais* "must be applied in strictness, and the admission or act relied on must clearly appear to have been made or done by the party who is sought to be bound thereby.  Hence, estoppels must be certain to every intent, for no one shall be denied setting up the truth, unless it is in plain and clear contradiction to his former allegations and acts." *Hubbard v. Hartford Fire Ins. Co.*, 33 Iowa 325, 335.

"There must be a certainty about the alleged estoppel. The misrepresentation must be plain, not doubtful or matter of mere inference or opinion; for the courts will not suffer a man to be deprived of his property or security where he had no intention to part with it." *Blodgett v. Perry*, 97 Mo. 263.

"Every fact essential to an estoppel *in pais* must be clearly and satisfactorily proved." 16 Cyc. 812.

"Estoppels must be certain to every intent, and are not to be taken by argument or inference." 11 Am. & Eng. Ency. of Law, p. 388; 1 Greenleaf on Evidence, Sec. 22.

It is true that, in some of the cases cited for the plaintiffs, there are expressions to the seeming effect that the question of an ostensible partnership is always one for the jury; but such expressions cannot be presumed or construed to mean that this rule is applicable to all such cases, without regard to the state of the evidence.  The true rule in this, as in the trial of other jury issues, is that, at the close of all the testimony, if, to the judicial mind, the evidence, tested by the law of the issues and the rules of evidence, is not sufficient to justify a jury fairly and reasonably in finding a verdict for the plaintiff, the court should so direct the jury. *Pleasants v. Fant*, 89 U. S. 116 (22 L. Ed. 780).  The burden of proof in this case was at all times upon the plaintiffs, and, in our opinion, the record, tested by the rules of law applicable to the issues, fails to show a case for the jury.

For the reasons stated, the judgment below is reversed, and the cause remanded. In the absence of any showing to the trial court of new or additional evidence in support of plaintiffs' claim, it is our opinion that the case should be dismissed; but if showing be made which, in the judgment of the court, affords reasonable ground for belief that a recovery may be sustained under the rules of law herein approved, a new trial may be ordered.—*Reversed.*

GAYNOR, C. J., EVANS, PRESTON and STEVENS, JJ., concur.