WILLIAM HARVEY COLLINSON, Appellee, v. E. C. CUTTER et al., Appellants.

**NEGLIGENCE: Automobiles for Family Purposes.** A husband and
1 wife who maintain an automobile for family purposes, the husband as owner, and the wife and other members of the family as users thereof, are both personally liable for the negligence of a minor member of the family in operating the machine, under the personal control of the wife, and for a family purpose: the husband, because he has constituted the driver his agent; the wife, because she is, along with the driver, engaged in a common enterprise, with the driver under her control.

**TRIAL: Lack of Definiteness.** Lack of definiteness as to the right
2 and duty of the jury under a given state of facts is not prejudicial error, when the instructions are capable of being understood with reasonable certainty as expressing the true rule, and the verdict has ample support in the record. So held as to the relative duty of a driver in approaching one on the parking, or in approaching one on the public traveled way.

**TRIAL: Covering Unpleaded Issues.** It is proper for the court to
3 direct the jury to disregard matters which have been incidentally brought out on cross-examination, which constitute no defense to plaintiff's action, but which might impress the jury as constituting a defense.

**TRIAL: Weighing Matters Not in Evidence.** Correctly instructing
4 the jury as to the rule governing the weighing of expert opinions on hypothetical questions, and the rule governing the weighing of expert opinions based on personal examination, is not reversible error simply because no hypothetical questions were asked

TRIAL: Permanent Injury—Sufficiency of Showing. Evidence reviewed, and held to furnish ample support for an instruction relative to recovery for permanent injury and deformity.

TRIAL: Mental Pain—Deformity as Independent Ground for Recovery. Instructions for the allowance of damages for past and future physical and *mental* pain suffered on account of an injury, necessarily include authority to the jury to give due consideration to any permanent deformity resulting from the injury, and the jury will be presumed to have so understood, even though, in another division of the instructions, the jury is told to make such allowance for such deformity. It will not be presumed that the jury understood that they were authorized to make a double allowance.

*Appeal from Polk District Court.*—HUBERT UTTERBACK, Judge.

JANUARY 22, 1919.

REHEARING DENIED MAY 21, 1919.

ACTION to recover damages for personal injury. Opinion states the facts. Verdict and judgment for plaintiff in the court below. Defendants appeal.—*Affirmed on condition.*

*Clark, Byers & Hutchinson,* for appellants.

*Stipp, Perry, Bannister & Starzinger,* for appellee.

GAYNOR, J.—This action is brought by the plaintiff, through his mother and next friend, to recover damages for personal injuries.

1. NEGLIGENCE: automobiles for family purposes.. It is claimed that, while rightfully on a public street of the city of Des Moines, he was negligently and carelessly run over and injured by an automobile driven by the defendant Joseph Cutter. It is alleged that Joseph was acting as the servant, and under the direction and control, of the other defendants. On this relationship their liability is predicated.

The following facts are not in dispute: The accident occurred on the 1st day of April, 1916. The plaintiff was then but 5 years of age, and was in the act of crossing Forest Avenue (which runs east and west in the city of Des Moines), from the south side to the north side, at a point between Twenty-seventh and Twenty-eighth Streets. While so doing, he was run over, dragged, and injured by an automobile driven by the defendant Joseph. Joseph, at the time, was about 14 years of age, and was accompanied by his mother, Mrs. E. C. Cutter. The automobile was owned by his father, the defendant E. C. Cutter, and kept by him for family use. Joseph was a member of the family, and as such member, had permission to use the automobile on the public streets.

The cause was tried to a jury, and a verdict returned for the plaintiff against all the defendants, and they appeal.

There is no question in this record, we take it, as to the negligence of the defendant Joseph, and that his negligence was the proximate cause of the plaintiff's injuries, and that plaintiff cannot be charged with any negligence contributing to his injuries. We take it, further, that there can be no supportable contention, after the record is fairly considered, that the plaintiff is not entitled to a verdict against all the defendants in some amount. That Joseph was negligent,. and that the injuries to this plaintiff were the proximate result of the negligence charged, is too plain to make it the subject of debate.

The liability of the father for Joseph's negligence is predicated on the thought that he was the owner of the auto-mobile; that he had purchased it for the use and pleasure of his family, and kept it for that purpose; that Joseph was a member of his family and a minor, and had been given permission to use the automobile for the very purposes for which it was kept, and was so using it at the time of the accident, with the permission of his father, either ex-

press or implied. This thought runs through all the case, and has support in the evidence. The defendant father is, therefore, chargeable with the negligence of Joseph, under the rule laid down in *Lemke v. Ady,* 159 N. W. 1011 (not officially reported). In the *Lemke* case, the district court told the jury, touching the responsibility of the defendant for the acts of his son, that, if they found that the defendant kept the car for use as a family car, and permitted his son to take defendant's wife out in it, they would be warranted in finding that the sum was his father's agent, and was using it in his father's service. The instruction was approved by this court, and the court, in passing upon it, said:

"The testimony tended to show that the auto was kept for the pleasure and amusement of the family; that both the son and the father drove it; that the mother often directed its use; that it was kept, not only for the family use, but for the entertainment of guests. On the day of the accident, the son drove the machine, and his mother, with two visiting guests, were being taken on a pleasure trip from West Liberty to Iowa City. During this drive, the accident occurred. There was no error in the instruction."

In *Dircks v. Tonne,* 183 Iowa 403, the rule laid down in the *Lemke* case, supra, was approved. In this *Dircks* case, the evidence showed that the car was owned by the defendant; was driven by his son. The car so driven collided with the plaintiff's car. There was a judgment for the plaintiff for one dollar. The defendant appealed, claiming that he was in no way responsible for the negligence of his son. On this theory, at the conclusion of the evidence, he moved for a directed verdict. His contention was that his son, who was, at the time of the accident, operating the car, was not acting for him, or on his behalf, either as servant or agent, and therefore, if negligent, the negligence could not be charged to him. This motion was overruled. He claimed that it should have been sustained. In that

case, the evidence tended to show that the defendant purchased the automobile for general use, and particularly for the use of himself and family in attending church; that the defendant had never operated the car; that his sons, who drove the car at the time of the accident, were the only members of the family who had done so. The sons took the car with the knowledge and consent of the defendant, and were using the car for the specific purposes for which it was purchased and kept by this defendant. The only feature that might seem to distinguish it from the case at bar is that the court found in that case that the specific purpose for which the car was being used was the specific purpose for which the defendant had purchased and authorized its use. The distinction is not available here. In the case at bar, the defendant purchased the car for the use of his family, to be used as a family conveyance, for any legitimate purpose to which the family might be disposed to put it. The evidence shows that it was being used for one of the purposes for which the automobile was purchased and kept by this defendant. The *Dircks* case, therefore, is authority for holding that, in the case at bar, the negligence of the son was rightly charged to the father.

As to the liability of Mrs. Cutter for the negligence of her boy, we have no doubt under this record. The car was a seven-passenger car. The driver was her son. Her husband was the owner of the car. It was kept for family use. While there is some slight effort to conceal the true relationship existing between the mother and the son on this particular trip, the whole record discloses, with sufficient clearness to justify us in saying so, that the purpose of this trip was a family purpose; a purpose in which the housewife of the family was particularly interested. On this day, a visit was made to a farm operated by Mrs. Cutter's brother. Frequent prior visits had been made to this farm, for the purpose of getting family supplies. On this particular

day, the visit was made for that purpose, and apples and
eggs obtained. The car was returning with these supplies
at the time of the accident. Mrs. Cutter testified:

"This boy would frequently drive the car when I was
along. When I saw him take it, I would go along with
him. We often went out to my brother's farm, northeast
of the city; sometimes as often as once a week, if the roads
were good. Once in a while, when we were out of eggs, or
something like that, we went out to the farm to get them.
On the day the accident happened, I think we were bringing
some apples and eggs home from the farm."

Bearing upon the exercise of control over the boy, she
testified:

"The boy was under fifteen years of age. If I thought
he was driving the car too fast, I would speak to him about
it, and he would tell me that he was not going fast, but
would slow up, if I insisted upon his doing so. I went along
generally. He was in the habit of driving for members of
the family, when the older boys were not around. I gen-
erally went where he went. I have asked him to drive me
places. My children are expected to mind. He was living
at home as a member of the family, and we were supporting
him."

Defendant E. C. Cutter testified:

"I bought the car for family use; for the convenience
and pleasure of the family. I don't think my wife ever went
out alone with it. She most always took one of the chil-
dren with her. She had a right to use the automobile when-
ever she desired."

Joseph Cutter testified:

"My uncle lived out there on the farm, and we used to
go out to see him. We got some butter and eggs, and were
on our way home from the farm when the accident hap-
pened. I usually drove this car for the family, and had
permission to drive it whenever I desired. We left home at

two o'clock, and we were returning, and as we were return-
ing, about six o'clock, the accident happened.  I don't re-
member whether I asked anybody for the car that day.  My
father was not at home.  When he was at home, as a rule,
I asked him for the car when I wanted to take it."

It appears, therefore, that this was a family car, kept
for family use, and that this boy had permission to drive
it.  The jury could well find that the mother had control
over its use, in the absence of her husband,—at least, con-
trol so far as the children were concerned; and that it was
being driven at this time by her minor son, with her per-
mission, and for purposes of her own.  As bearing on this,
see *Daggy v. Miller*, 180 Iowa 1146.  There is no basis in
this record for the suggestion that the mother, Mrs. E. C.
Cutter, was riding in this automobile simply as the guest
of her son, and, therefore, the authorities to the effect that
a guest riding by invitation is in no way responsible for the
negligence of the driver of the vehicle in which he is riding,
have no bearing upon the question here submitted.  Indeed,
we think the jury could well find that the automobile was
returning from a journey which was suggested by the wife-
ly instincts of the mother, begun and carried through for the
purpose of procuring provisions for herself and her family.
The mother had the dominating mind.  The purpose of the
mother controlled.  The journey was undertaken and car-
ried out through the direction of the mother.  The authori-
ties are uniform to the effect that, if the driver was negli-
gent, and the party sought to be charged was engaged with
him in a common enterprise at the time of the happening
of the act upon which negligence is predicated, the party
charged is equally guilty with the negligent doer of the
act, the same as if he had negligently done the act himself;
and we think the facts in this case bring it within the rule
of these cases.  *Carpenter v. Campbell Auto. Co.*, 159 Iowa
52, and cases therein cited.  The rule is that, if the driver

is guilty of negligence, and injury results, his negligence may be imputed to the party riding with him, in the event the driver was under the control and direction of the party charged; or in case the party charged had the right to control and direct the driver, and failed to do so; or where the driver and the party sought to be charged are engaged in a common enterprise; or where the driver is engaged in an enterprise of any kind for the use and benefit of the party charged, and is subject to his control. These questions, under this record, were clearly for the jury. They were in the record, and a finding against this defendant has support in the evidence; and so we say that she, too, was rightly charged with the negligence of Joseph. So much for the preliminary.

The contention of the defendant, however, on this appeal, is that the court erred in its instructions to the jury; and the suggestion is that, if the court had properly instructed the jury, a different result might have followed.

2. TRIAL: lack of definiteness.    If, with the law correctly stated, the result must be necessarily the same, if no other result could have been reached by the jury, under the record made, than was reached, it would hardly seem logical to say that the complaining party was prejudiced by the action of the court in the manner of presenting the case to the jury in its instructions. It is the duty of the jury, of course, to follow the instructions given them by the court, whether right or wrong. If the court positively instructs the jury on a question before it, touching its duty under the law, the jury is bound to follow it, though the direction and instruction be, in effect, wrong. But where the instructions do not direct the jury into any definite channel of thought or purpose, or do not definitely direct them as to what is their duty or right in the premises, under the given state of facts, and the conclusion of the jury, under the

record and the law as it actually is, has ample support in and is justified by the whole record, then it cannot be said that the defendant was prejudiced by the action of the court. But where the court directs the jury into certain channels of thought and purpose in the consideration and determination of the case, gives them definite direction as to what they should or should not do in the premises, under the law, or permits them to consider matters which ought not to be considered by them in the disposition of the case, then prejudice will be presumed, because there is no way of knowing whether the jury would have arrived at the same verdict under the record, had they not been controlled by the directions of the court.

As long as we can find no fault with the doctrine of the instructions, they cannot be held bad for defects in the language. If they are capable of being understood with reasonable certainty, as expressing the true rule, if, when read as a whole, they fairly present the law, and serve as a correct guide to the jury, in the particular case, in determining what the rights of the parties are under the law, they serve all the purpose that instructions are intended to serve in the disposition of the case by the jury.

The defendant complains of the action of the court in the giving of the eighth, ninth, fourteenth, sixteenth, nineteenth, and twentieth instructions.

The eighth instruction tells the jury that the public highways are for the use of the public generally, including those who operate automobiles; that the term "public highways" applies to and includes the streets of our cities; that every operator of an automobile on a public highway or street must drive the same in a careful and prudent manner, and at such a rate of speed as not to endanger the limb or life of any person; that one driving an automobile, upon approaching a pedestrian upon any part of a traveled highway, and *not upon a sidewalk,* owes a duty to the pub-

lic to slow down, and give timely signal with a horn or other device; and that a failure to do so would constitute negligence.

The defendant concedes that the instruction is a correct exposition of the law, but says that it was wrong, as applied to this case, for the reason that, when the boy was discovered, he was not upon the traveled part of the street, but up over the curbing on the south side of the street. Defendants state their complaint somewhat this way: The instruction was especially prejudicial to the defendants for the reason that the jury was thereby led to believe that, even though plaintiff was not on Forest Avenue proper, at the time he was discovered by the driver, yet they owed to him practically the same duty as is required, under the statute, of a driver approaching one on a *traveled* portion of the street. The defendants' contention is that the plaintiff was not on Forest Avenue, but was over the curbing, when discovered. We think the criticism is hypercritical. The court simply told the jury, in this instruction, and rightly told the jury, that, in approaching a pedestrian upon any traveled portion of the street that is traveled by automobiles, it was the duty of the operator to slow down and give timely signal, but that that duty did not apply when the pedestrian was not upon the portion of the street traveled by automobiles, but upon a sidewalk. The record discloses that, at some time before the boy was struck, he was on that portion of the street set apart for use by automobiles. It was shown that, at some time before he was injured, he was discovered by the driver of the automobile, on this part of the street. It was not only shown that he was discovered, but that the automobile followed him, as he crossed the street from the south to the north, and caught him at the north curb. The court called the jury's attention to this fact, in the same instruction, and said that the plaintiff had a right to cross Forest Avenue at that place,

and that it was the duty of the operator to look out for the presence of the plaintiff, and to control and drive his automobile in such a manner as not to endanger him while crossing the street. The only criticism that really could be made of this instruction is that the jury must find that the boy was south of the curb, and not upon the traveled portion of the street until he was struck; that he darted out from a place of safety into a place of danger, and was caught there, in a place of danger, under such circumstances as made it possible for the jury to find that at no time a duty arose on the part of the driver to do these things which the court told the jury he should do for the protection of the boy. The record shows that the traveled portion of the street was from 40 to 43 feet wide; that the defendant was approaching the place where the boy was, from the west, on the south side of the street; that the boy ran across the street, and was caught by the machine practically at the curbing on the north side of the street. Of this there is no dispute in the record. There is no dispute, further, as to the fact that the boy was seen by the driver of this automobile while in the traveled portion of the street, and before he was struck. Whether seen in time to avoid the injury, was a question for the jury. We think, however, that the question could only be resolved in favor of the conclusion that the driver saw the boy in the traveled portion of the street for such a length of time before he struck him that, by the exercise of reasonable care, he could have controlled the automobile, and avoided reaching the boy at all. The instruction states the law correctly, both abstractly and as applied to the facts of this case.

Instruction 9, complained of, tells the jury that plaintiff's right to recover is in no wise affected by the negligence, if any, of his father or mother or sisters; and that, even

if the jury should consider that the parents
or the sisters, or any of them, were negli-
gent in the custody and control of the boy,
that would not defeat plaintiff's right to
recover; that he could only be defeated by negligence on
his own part, contributing to the injury.

3. TRIAL: cover-
ing unpleaded
issues.

The complaint of this instruction is that it injected an
issue made neither in the pleadings nor in the evidence;
that there was no evidence that called for the instruction.
It is true that there was no evidence that called for the
instruction. It is true that the negligence of the parents,
as a ground for defeating recovery on the part of the boy,
is not urged in any pleading filed. It is true that no evi-
dence was directly offered by the defendant, tending to sup-
port a contention, if urged, that such negligence would de-
feat recovery on the part of the boy. It is true that it was
not vociferously urged, at any stage in the case, as a ground
for defeating recovery by the boy. The jury's attention,
however, was directed, in the cross-examination of certain
witnesses, to the fact that possibly those who had the cus-
tody and control of the child, and who should have cared
for him, were negligent in permitting him to be upon the
street. This was made especially prominent in the cross-
examination of the mother. She was called upon to say:

"I don't remember that I remarked that I blamed my-
self more than the operator of the automobile. I didn't
leave the boy in charge of anyone in particular, that after-
noon. Both girls were at home. I always advised them to
look after Billie."

We think this was a proper cautionary instruction, in
view of the suggestion made in this cross-examination of
the mother, and not prejudicial. It removed from the minds
of the jury the poisoning effect of the suggestion that the
mother might have been guilty of negligence in permitting
the boy to be upon the street; that a paramount duty rested

upon the mother to keep her children from the public
streets, upon which automobiles were likely to be driven;
that, if the mother had discharged her full duty to the child,
he would not have been there,—from which the jury might
draw the inference that he was not rightly there.   However that may be, we are satisfied that, since the defendant
disclaims any thought of bringing to the minds of the jury
a suggestion such as we have indicated, and disclaims any
thought that any negligence of the mother in caring for the
child could be imputed to the child, we think the instruction
was not prejudicial to any rights the defendant had, or
claims to have had, in the premises.

The fourteenth instruction gives the usual instruction
properly given in cases where hypothetical questions have
been propounded to expert witnesses, and contains the usual
caution to the jury that, before they can give
effect to the opinions expressed by experts
upon hypothetical questions, they must be
able to find that the facts upon which the
opinions are based, appearing in the hypothetical questions,
are supported by the evidence, and further:

**4. TRIAL:** weighing matters not in evidence.

"If the facts are not found to be as stated in the hypothetical question, the answers thereto or the opinion of the
witness based upon said question is of no value, and cannot be considered."

It is the claim, and it is right, that no hypothetical
questions were propounded in this case.   No expert witnesses were called upon to give an opinion based upon a hypothetical question.   This part of the instruction might well
have been omitted.   All the experts who gave opinions based
their opinions on matters acquired from a personal examination of the boy.   We do not think the part complained of
was prejudicial in this case, for the court followed this instruction by saying:

"But when an expert witness testifies as to matters

of fact from personal knowledge, or examination of the person, then his testimony as to such facts, within his personal knowledge, should be considered the same as any other witness who testifies from personal knowledge;" and that his opinions, based upon such knowledge or examination, should be given such weight as the jury believed it entitled to receive, the same as any other witness.

Instruction 16 is said to be wrong, for the reason that there was no evidence upon which a finding of permanent pain and disability or permanent injury could be based, and that the instruction authorized the jury to consider it in estimating damages. This instruction reads as follows:

5. TRIAL: permanent injury: sufficiency of showing.

"You are instructed that it is claimed by the plaintiff that the injuries of which he complains will result in permanent pain and disability, and in permanent deformity and disfigurement of his right leg. As to this, you are instructed that the burden is upon the plaintiff to show the character and extent of the injuries received by the plaintiff by reason of the accident in question, and unless the plaintiff has shown, by a preponderance of the evidence, that the injuries of which he complains are permanent, or that he will in the future suffer pain therefrom, or that he will suffer permanent disability therefrom, or that he will be permanently deformed or disfigured thereby, substantially as alleged in the petition, then, in such event, you are instructed that you cannot allow the plaintiff anything for and on account of said claims."

Of course, it was wrong to submit this as a basis for assessing damages, if there was no evidence that the injury was permanent, and no evidence that made it reasonably certain that the plaintiff would suffer pain in the future; and so it becomes necessary to examine the record to find whether there was any basis in the evidence to justify this instruction. It was shown at the trial that, since he was

able to get about after the injury, his right leg turns in and trips him; that his left toe catches on his foot, as it turns inward, and causes him to trip and fall. It appears that, after he had been able to get out, there was some deformity in his right leg, the leg that was injured, affecting its functions. It was further shown that his foot turned in, and that, when he ran, he would trip himself and fall; that it seemed as if the right foot turned in across the other foot and tripped him, and he fell. It further appeared that, since the injury, the right leg is bowed; that the right foot turned at a very acute angle; that the cords in this leg, when pressed, caused pain; and that some of the muscles or ligaments had been torn or pinched off.

Dr. Leir, who had examined the plaintiff, testified:

"I suppose the bones are now as straight as they ever will be. They are not absolutely straight."

He gave his opinion, however, that the crook in the bone did not affect the efficiency of the limb.

Dr. McDevitt testified:

"There was a fracture of both bones, about the junction of the lower middle third of the leg."

He was called to attend the boy at the time he was injured. He testified that the bones were nearly through the skin, but not quite; that he could feel them easily; that there was a bad flesh wound near the posterior portion; that the tendon was severed, and the muscular structure looked about as much like a piece of beefsteak as anything else. It would not hold a suture. The destruction of the muscular tissue was above the fractured bones. There was a loss of muscular structure in the leg. A part of the muscle has never been replaced. The internal hamstring was severed and united. If it had not united, there would have been more loss of function than there is now; but it is weakened, due to the fact that there is not the amount of muscular structure there that there was normally. Nor-

mally, the tendon part of the muscle has muscle structure which will give it strength. There is a superficial set of muscles there, a deep layer of them; two of the superficial muscles go down the side of the leg and unite. One goes down the one side and one on the other side, and they unite. One of these was injured, which weakens the action of the muscle, as far as flexion is concerned on that side. There is always a pull, or a certain amount of strain, on these muscles when they contract. Assuming that one side of these muscles was weakened, the effect on the movements of the leg and the foot, of course, would depend upon the amount of weakening there. If the internal part of that muscle was injured to such an extent that it would not contract, then it would interfere with the function of the leg,— drawing up the leg. There is a natural relation in regard to the functions that the different muscles and tendons of the leg have to perform as a matter of movement and function; they are all related. The loss of muscular structure here will never be wholly replaced. There seems to be now an impairment of the motion of the leg, due to the flexion of the muscles. There is a little bow in the bones. So far as the muscle is concerned, it lacks muscular strength. So far as the muscle which is *there* now is concerned, there is a complete recovery.

Dr. Ely testified:

"We have examined the boy, and found a little bow in both legs, perhaps a little more in the right leg than in the left. There was some evidence of a thickening of the bones about the middle of the leg. I think there was a piece of muscle pinched off, and that this has been replaced by fibrous tissue."

The boy was stripped and examined before the jury. Dr. Ely, who made the examination, testified to the jury:

"Now, of course, there isn't a question that there is a little chewed out there, in a way, and there is a little sink-

ing there, and a little contraction; but you can see I can pick up the belly of the muscle in that manner, and there is just a line of gristle tissue right here, and there is a little tenderness up at this point. The injury was at the belly of the muscle of the calf. It is used in going up and down steps, and in jumping. It is only partly used in holding the balance when standing perfectly still. The destruction or disturbance of any one muscle has a tendency to disturb the equilibrium. The muscles of the bones and the tendons, etc., are all related, and work together. I think that the destruction of any part of the leg would tend to disturb the equilibrium of the whole mechanism, at least temporarily. I cannot tell absolutely as to what the after results will be. That would require a prophet. I am simply telling the jury what I think will or will not result from the injury, basing my opinion upon the case and observation of similar cases. My best judgment is that, after the boy is 16 years of age, or 18, fully developed, he will not have any disability in his leg."

Speaking as to the fact that the boy's right foot turned in, and tripped him, Dr. Fred Moore testified:

"Assuming the boy had no trouble before the injury, I would not say that the condition will be permanent. If he had that much inversion, he would have some deformity to overcome, but it might be overcome entirely by development or training. I do not express any opinion as to how long it will probably take to overcome that condition. I discovered no such condition in this case. * * * If the boy's foot turns in and trips him, that condition will be due to something else than the break of the bones, probably due to injury to the nerves; and this might have been caused by an automobile, running over the leg. Though I discovered nothing in my examination, it is quite possible that he does walk with his foot turned in, when he is not thinking."

Dr. George Moore, an osteopathic physician, testified that he had examined the plaintiff. He testified:

"The injury to the muscles of the leg would have some effect upon the movements of the foot. In this case, there was some injury to the muscle. I could not tell whether there was any portion of the muscle gone, or whether the muscle was injured at the time of the accident. The result of my observation was that the right leg was approximately a quarter of an inch shorter than the other. There is a difference in the circumference of the two legs at the calf. Such an injury would naturally cause considerable pain and suffering, and would have a tendency to weaken the leg temporarily. In an injury such as this, during the period of repair, oftentimes a change of weather, or things of that kind, causes soreness. A dislocation of the bone of a fracture may have a tendency, in after years, to bring on pain, if the recovery is not complete. Those pains have made their appearance in cases where there was a fairly good recovery in proportion to the injury. They are usually caused by impingement of nervous structure or circulation."

Most of the witnesses, however, gave their opinion that the boy would recover fully from the injury.

We think there was sufficient evidence in the record to justify the submission of this instruction to the jury.

The objections to the nineteenth instruction are fully answered by what we have said heretofore. It relates to the sufficiency of the evidence to justify the submission of the cause to the jury as against Mrs. Cutter, it being claimed that there was no basis in the evidence for any contention that she was liable for the negligence of Joseph.

Some of the errors urged as to the twentieth instruction are answered by what we have already said in discussing the sixteenth instruction: that is, the sufficiency of

the evidence to justify submitting the question of permanent injury.

It is further claimed that the court erred in this instruction in submitting to the jury the fact of deformity and disfigurement, as an independent basis for assessing damages, independent of, and not dependent on, whether that disfigurement and deformity resulted in mental pain and anguish. If the instruction is justly subject to this criticism, we think that, under the authorities, it cannot be approved. The court told them that, if they found for the plaintiff, they should allow him such sum as would compensate him for physical and mental pain, if any, endured or suffered in the past, and the present worth of such sum as the evidence showed, with reasonable certainty, would compensate him for further mental pain; that they should allow him such sum as found from the evidence to be the present worth of the damage, if any, that would result with reasonable certainty in the future, on account of the impairment of his future earning capacity after he should have attained the age of 21 years, and such a sum, if any, as the evidence made reasonably certain would compensate the plaintiff for permanent deformity and disfigurement of his right leg. Having directed the jury to allow for the future mental pain and suffering which the evidence made reasonably certain he would endure in the future as a proximate result of the injury, it is claimed that the court told the jury that they might also allow him, in addition, damages for the disfigurement. The evident thought of the critic is that the recovery for mental pain and anguish, as a proximate result of the injury in the future, did cover and would compensate him for disfigurement, and that to permit the jury to consider disfigurement as an independent substantive ground upon which to base damages, is wrong. Mental pain and suf-

6. TRIAL: mental pain: deformity as independent ground for recovery.

fering are not an independent ground on which to base damages, but are considered, in estimating the damages for the injury, as a part of the injury itself. The injury is what produces it. It may be physical or mental. The mental pain may be the result of physical suffering, induced by the injury, or the mental pain and suffering may be due to the humiliation which flows from disfigurement, which is a part of the injury. That disfigurement may be considered in estimating damages, see *Newberry v. Getchel & Martin L. & M. Co.*, 100 Iowa 441, 457.

The instruction, therefore, while not aptly worded, conveyed to the jury the thought that, in estimating mental pain and suffering, endured by the plaintiff as a proximate result of the injury, they should consider the disfigurement; that disfigurement was a proper element to be considered in estimating mental pain and anguish. It is a matter of common knowledge that physical deformities and disfigurements are humiliating to one who is called upon to bear them. Humiliation is a mental condition produced by disfigurement, attended by mental pain and suffering. It is not thinkable that the jury could have been misled into thinking that disfigurement, which in no way impaired efficiency, which caused no physical pain, could produce any damage to the person affected other than the mental anguish that attended it. Humiliation follows a knowledge of the fact of abnormal physical conditions exposed to the view of others, and this is attended by mental pain. If we should say that the court did intend, and the jury could understand, that disfigurement is an independent ground for assessing damage, we might be inclined to agree with counsel; but from no angle can disfigurement be approached that will expose to the mind any other element of damage than humiliation, producing uncomfortable mental disturbances. What estimate can a jury put upon disfigurement other than that which follows logically, and always

follows logically, from disfigurement, to wit, mental disturbance producing humiliation, which, in its turn, is followed by mental suffering? It is true, the court seems to have thought it necessary to divide these different subjects. Now, if the court had said to the jury, "You may compensate the plaintiff for physical and mental pain which you find will result with reasonable certainty on account of the injury, including the disfigurement following the injury," there could be no question about the correctness of the instruction; and we think that the instruction does no more than this, even as subdivided by the court. The pain and suffering that flow from the injury include pain and suffering that flow from the disfigurement. Therefore, the injury as a whole includes disfigurement, and must be considered when damages are assessed for mental pain and suffering. Mental pain and suffering are traced to the injury, are the effect of the injury upon the mind, flow from the injury, and are not independent of the injury. and that is the reason why the injury must be considered as a whole, in estimating the amount that should be allowed for mental pain and suffering. When the court said, "You should allow for disfigurement," the jury could not have understood the court as meaning by this, more than that they should allow for the mental pain and suffering which followed the disfigurement. In estimating damages that flow from the injury, mental pain and suffering must be considered, if it is made reasonably apparent that mental pain and suffering will follow the injury. The injury includes the disfigurement. The court, therefore, said nothing more to the jury than that they should consider the injury and the pain and suffering, if any, which flowed from the injury; and that, in considering and determining the amount of damage from the injury, they should include disfigurement, as a part of the injury out of which the mental pain and suffering flowed. Though this instruction could have

been more aptly worded, we do not feel justified in reversing the case because of the manner in which this thought was presented. It could not possibly have been misleading to the jury. The instruction could have conveyed to the jury no other thought than that disfigurement was a part of the injury on account of which they could allow the plaintiff for mental pain and suffering, if it was made reasonably certain that pain and suffering would follow the injury. See *Coombs v. King,* 107 Me. 376 (78 Atl. 466); *Heddles v. Chicago & N. W. R. Co.,* 77 Wis. 228 (46 N. W. 115); *St. Louis, I. M. & S. R. Co. v. McMichael,* 115 Ark. 101 (171 S. W. 115).

It is next contended that the verdict is too large. In this, we are inclined to agree with counsel for appellant. Viewing the whole record, considering the age of the boy, the character of the injury, considering the repairs which nature has made, with the aid of science, in producing approximately normal conditions, we are inclined to believe that the verdict is excessive, but we do not feel disposed to reverse the case on this ground, but will say that if, within 60 days from the filing of this opinion, the plaintiff will file with the clerk of this court a statement, in writing, that he will consent to have judgment entered in this court in a sum not exceeding $2,500, with costs and interest from the date of judgment, his case will be affirmed; otherwise, reversed.—*Affirmed on condition.*

LADD, C. J., PRESTON and STEVENS, JJ., concur.